STATE OF NORTH CAROLINA v. FRANK MORRIS PENLEY

No. 166A85

(Filed 29 August 1986)

### 1. Homicide § 16— dying declaration—admissibility

The trial court in a first degree murder case did not err in admitting as a dying declaration the video tape recording of the victim's identification of defendant, since at the time the victim identified defendant, the victim was in a hospital bed in an intensive care unit, was attached to a ventilator, and was being fed through tubes running through his nose and into his stomach; deceased gave the statement the day before he died; and a witness testified that she heard a nurse ask the victim several days before he died if he knew he was dying and the victim responded affirmatively.

### 2. Criminal Law § 73— victim's identification of defendant—subsequent death—admissibility of statements

Statements made by a murder victim, before he knew of his impending death, in which he identified defendant as the person who shot him possessed circumstantial guarantees of trustworthiness to make them admissible under N.C.G.S. § 8C-1, Rule 804(b)(5) where nothing in the record tended to show that the victim had any motivation to tell anything other than the truth to those investigating the shooting; from the moment he was found until his death, the victim never wavered in his identification of defendant as the man who shot him; and all information contained in the statements complained of was corroborated by the victim's dying declaration or other admissible evidence. Furthermore, the victim's statements identifying the defendant as the man who shot him obviously were offered as evidence of a material fact and were more probative on the point than any other evidence which could be procured by reasonable efforts, and the admission of the statements of the victim served the general purposes of the Rules of Evidence and the interests of justice.

### 3. Criminal Law § 73— hearsay testimony—written notice required—court's assumption that requirement was met

Where the State specifically indicated to the trial court that it was relying *inter alia* on N.C.G.S. § 8C-1, Rule 804(b)(5) in offering into evidence statements by a murder victim, and defendant raised no objection based upon an absence of written notice, it was permissible for the trial court to assume that the statutory requirement of written notice was met.

### 4. Criminal Law § 75.9— statement volunteered by defendant—admissibility—detailed specific findings required

The trial court did not err in allowing into evidence statements defendant made to police officers after he indicated that he wanted an attorney before answering any questions, though the trial court would have been well advised to make detailed specific findings, where an officer's testimony concerning the events surrounding defendant's inculpatory statement was uncontroverted; and the officer's testimony indicated quite clearly and without conflict that, after first indicating that he would exercise his right to counsel, defendant

himself initiated further communication and conversations with the officer and voluntarily waived his rights after they had been fully explained to him.

**5. Criminal Law § 75.9— defendant's spontaneous statement—admissibility**

The trial court did not err in allowing the State to introduce a statement which defendant made to police after he had retained counsel but without counsel present since the statement in question was spontaneous and no interrogation in any form occurred at the time.

**6. Homicide § 23.2— proximate cause of death—requested instructions given in substance—no error**

There was no merit to defendant's contention in a murder case that the trial court erred in its instructions to the jury on the question of the proximate cause of the victim's death, since the court agreed to give and did give in substance the instruction on proximate cause requested by defendant.

**7. Homicide § 21.2— death resulting from injuries inflicted by defendant—sufficiency of evidence**

There was no merit to defendant's contention that the State's evidence was insufficient to support a finding that the gunshot wound allegedly inflicted by defendant was the proximate cause of the victim's death where there was expert medical testimony that the victim died from pneumonia which was directly related to the gunshot wound.

**8. Criminal Law § 102— reopening of defendant's argument properly allowed—limitation of argument proper**

The trial court did not abuse its discretion in allowing defense counsel to reopen his closing argument to argue six contentions prepared by defendant *pro se* but in denying argument with regard to 17 other contentions which the court found to be either unsupported by the evidence presented, improper subjects for jury argument, or repetitions of defense counsel's arguments made during his closing argument the previous day. N.C.G.S. § 84-14.

**9. Constitutional Law § 31— appointment of pathologist—denial of request proper**

The trial court's denial of defendant's motions for the appointment of a pathologist or other medical experts was not error, although defendant arguably made a threshold showing of a specific necessity for the assistance of such experts, since defendant was provided with a copy of the autopsy report prepared by the pathologist who performed the autopsy; defendant did not show what, if anything, an additional pathologist could have offered in his defense; he did not show that he was deprived of a fair trial or that he would have been materially assisted in the preparation of his defense had his motions been granted; and defendant had available to him and used ample medical expertise in preparing and presenting his defense. N.C.G.S. §§ 7A-450(b), 7A-454.

**10. Criminal Law § 138.14— mitigating factors outweighed by one aggravating factor—finding not erroneous**

Defendant did not show that the trial court abused its discretion in finding that the single aggravating factor of prior convictions outweighed the seven mitigating factors found.

**11. Criminal Law § 124— verdict sheets improperly filled out—acceptance of verdict proper**

The trial court did not err in accepting the jury's verdicts where the verdict sheets returned by the jury had the word "yes" in the space provided for the word "guilty" and the date "1 March 1985" in the space provided for the words "not guilty," since the trial court asked the jury foreman specific questions as to the jury's intent when the verdict sheets were completed; the foreman stated as to each verdict that he put the date in the incorrect space and that he meant nothing other than to indicate the date; the entire jury agreed with the foreman; and the jury was polled and each juror individually agreed with the verdicts as submitted.

APPEAL by the defendant from judgments and commitments entered on 1 March 1985, by *Ferrell, J.,* in Superior Court, CATAWBA County. Heard in the Supreme Court 12 March 1986.

*Lacy H. Thornburg, Attorney General, by Thomas J. Ziko and Laura E. Crumpler, Assistant Attorneys General, for the State.*

*Randy D. Duncan for the defendant-appellant.*

MITCHELL, Justice.

The defendant was convicted upon proper indictments for first degree murder, first degree kidnapping and robbery with a firearm. He was sentenced to serve consecutive sentences of life in prison for first degree murder, forty years for first degree kidnapping and forty years for robbery with a firearm.

The defendant appealed the murder conviction and the resulting life sentence to this Court as a matter of right under N.C.G.S. § 7A-27(a). The defendant's motion to bypass the Court of Appeals on his appeal of the kidnapping and robbery convictions was allowed by this Court on 8 April 1985.

By his assignments, the defendant contends that the trial court made many errors. He contends that the trial court erred by permitting the State to introduce a video tape recording of the victim's identification of him from a photographic lineup. He argues that the trial court erred by allowing the introduction of testimony concerning various statements made by the victim, as well as statements made by the defendant while in custody. He contends that the trial court erred in its jury instructions concerning the proximate cause of the victim's death and by denying

the defendant's motion for the appointment of a pathologist. He argues that the trial court erred by finding that his prior convictions were an aggravating factor and that this factor outweighed the mitigating factors. Finally, he contends that the trial court erred by denying his motion to dismiss and by limiting his trial counsel's closing argument. We find no error.

The State's evidence tended to show that around 3:00 p.m. on 23 December 1983, Jones Triplett was traveling down a dirt road leading to his home. He testified that he was looking to the side of the road and saw a man, later identified as Jack Hammond, the victim, lying on the ground. Triplett got out of his car and walked over to the victim. The victim stated, "I have been shot." His coat and the right side of his body were covered with blood. Triplett went to his house, called an ambulance, and then went back and sat with the victim. The victim was lying on his back and said "that it was not his friend but someone else" who shot him and that "it was a small Volkswagen van . . . ." He said that he had been shot at "a cafe . . . Pete's Cafe."

Dan Carlsen testified that he was employed by the Hickory Police Department and was on duty on 23 December 1983. He went to Frye Hospital at approximately 6:00 p.m. where he found the victim in the emergency room being attended by a physician. The victim told Carlsen that he did not know the name of the person who shot him but that Steve, the owner of Pete's, knew the person's name. The victim said that he was shot while walking from his assailant's house to a brown Volkswagen, and that the person who shot him "sold televisions and microwaves."

Steve Lieb testified that he was the manager of Pete's in Hickory. He knew the victim as a patron. On 23 December 1983, the victim arrived at Pete's sometime in the morning and began drinking beer. The defendant was also present drinking beer. Lieb called a taxi for the victim. It arrived "around lunchtime" and he told the victim his taxi had arrived. He did not see the defendant or the victim leave that day. He did see the defendant in Pete's "an hour or so" after the victim's taxi arrived.

Allen Robbins testified that on 23 December 1983, he was employed as a taxi driver for the Yellow Cab Company in Hickory. He testified that "about the middle of the day" he drove his taxi to Pete's and parked. The victim then "came out and got in

the car and then" the defendant "come out and said, 'you don't have to hire a cab, I will take you home.'" The defendant then paid Robbins the fare for his trip to Pete's.

Gary Wayne Lafone testified that on 23 December 1983, he was employed as a criminal investigator with the Hickory Police Department. On the day of the shooting he went to Frye Hospital where he interviewed the victim in the emergency room. The victim was wearing an oxygen mask and "his answers were not long, but in short sentences and was somewhat difficult to understand due to the mask and due to his injuries." The victim stated that he "[l]eft Pete's with a man in a small Volkswagen. Not a van, tan. Was to sell television and microwave. Back in drive behind house. Twenty minute drive from Pete's lunch. Steve Lieb saw man I left with."

On 24 December 1983, Lafone again interviewed the victim in the hospital. The victim again gave a description of his assailant and an account of the events occurring on 23 December 1983. The victim stated:

> We left Pete's in a Volkswagen. It was old brownish color, light tan or brown. It was real old, seventy model, small station wagon. We pulled off the street to the back door. Cement block house. It was in the city. We got to the house and I pulled my rings off and put them in my pocket. He said you don't trust me, do you? I told him that I trusted him . . . I asked him to take me to get my car. I walked out the door and he shot me in the back. I did not have any feelings in my legs and I felt it burning. I asked him to take me to the hospital and he said that he would. He put me in the back of the station wagon and took me to some woods where he put me out. The house was a cement block house.

Lafone testified that on 24 December 1983, the defendant was in custody. The defendant was advised of his Miranda rights, and "[h]e appeared attentive and understood . . . the rights that were read to him." Lafone testified that the defendant requested an attorney and was allowed to make several telephone calls. The defendant was unable to contact the attorney he desired. The defendant then said, "Who says that I did any of those things" while pointing to the warrants. Lafone advised the defendant that he could not answer his questions and would not talk to him without

an attorney. The defendant then stated that he did not want an attorney and signed a waiver of rights form.

The defendant first denied any knowledge of the incident. He then admitted to being at Pete's and paying the victim's taxi fare but denied leaving with the victim. He then stated that he and "Sonny" Burwell were at Pete's where they met the victim. The victim asked them to take him to the police station to get his car. The defendant told Lafone:

> [w]e all got in the car and left. I thought he was too drunk to . . . get his car so I asked if he wanted to go to my house and drink a beer . . . . We were in the basement. I was on the telephone and the man and Sonny was talking. I heard something mentioned about quaaludes. Sonny gave the man a bag and they started out the door and I followed them. As the man stepped out the back door, Sonny shot him . . . . Sonny came and asked if he could borrow my car and I told him yes . . . . I don't know what he did with the man.

The defendant then signed a consent form authorizing the search of his residence and vehicle.

On 29 December 1983, a photographic lineup containing six photographs was prepared. A photograph of Horace "Sonny" Burwell was included. The victim was unable to identify anyone in the lineup, including Burwell.

Finally, Lafone testified that the victim gave a description of the property that his assailant had taken from him: a wallet containing one hundred and forty-four dollars, a personal check, several credit cards, a Shriner's ring valued at two thousand two hundred dollars, and another ring for which he had paid seven hundred dollars. The victim also gave another statement concerning the shooting which basically corroborated his prior statement. In addition he stated that when he was shot the defendant "came over took my wallet out of my pocket and my rings and my keys and my knife, everything that I had in my pockets, . . . and I don't have any of it left."

Horace "Sonny" Burwell testified that he and the defendant are cousins and that he did not know the victim. On 23 December 1983, he was at home all day in his apartment. Bill Wetsill, a neighbor in the apartment complex, was there visiting. Burwell

testified that he and Wetsill "spent the day together there." He stated that he did not go anywhere near the premises of Pete's on 23 December 1983 and that he had not been there in "at least ten years."

William Wetsill testified that on 23 December 1983, he and Burwell "were together a lot at each other's places during the day." Burwell did not leave his presence during the middle of the day on 23 December 1983.

Allen Reece testified that he was employed as a wrecker driver on 24 December 1984. At the request of the Hickory Police Department, he picked up the defendant's Volkswagen station wagon and stored it in his building on that date.

David Spittel, a forensic serologist with the State Bureau of Investigation, testified that on 3 January 1984, he assisted the Hickory Police Department in the examination of the defendant's 1970 Volkswagen. He found a "large blood stain on the aluminum rocker panel of the passenger opening" and found slight blood smears in other areas of the car. He collected samples of the blood in the car and conducted some preliminary tests.

Mark Nelson, a forensic serologist, testified that he was employed by the State Bureau of Investigation in the crime laboratory. He performed tests on the blood found in the defendant's car, on blood samples taken from the victim and from the defendant, and on the blood found on a business card in the victim's' possession. He testified that "the blood from the automobile was the same as that from the victim and was dissimilar to that of the defendant." The blood sample taken from the business card was also consistent with the victim's blood and not consistent with the defendant's blood.

Steven Bryant, an investigator with the Hickory Police Department, also testified. On 7 February 1984, he, Officer Lafone, and a Mr. Hunt were in an elevator with the defendant and were escorting him to jail. Without being asked any questions the defendant voluntarily stated: "I know what you are doing and it is not going to do you any good. You are not going to find the damn rings." Bryant testified that no response was made by anyone to the defendant's statement.

Officer Lafone testified that on 24 December 1983, he showed the victim a photographic lineup containing six photographs. The defendant's photograph, taken in 1971, was included and was labeled with the number "5." The victim "went straight to photograph number five and made the comment, 'that is the man.'" The victim then was asked which one. He replied, "number five, that is the man that shot me. I can't be positive without my glasses."

Delores Whittington testified that she had known the victim for approximately ten years and had dated him for six or seven years. While visiting him in the hospital in February 1984, several days before he died, she heard a nurse ask the victim: "Jack, you know you are dying, don't you?" The victim responded affirmatively. The nurse then told him that his guardian angel was waiting for him, and that all he had to do was to reach out and his guardian angel would take him. He nodded affirmatively. Whittington testified that the nurse asked, "are you afraid, and she said it is normal to be afraid, and he whispered low, it is normal to be afraid and she said, God is with you and are you ready?" Whittington stated that the nurse initiated the conversation about death. Whittington further testified that the subject of death had arisen before in her conversations with the victim, and "he told me many times that he knew that he would not return home."

Timothy Hammond, the victim's son, also testified. On 7 February 1984, he was visiting his father in the hospital when several police officers, including Officer Lafone, were also present. A photographic lineup was conducted and video taped. The victim was wearing his glasses. Timothy Hammond testified that during the lineup his father was "so weak . . . he could not pick his arm up flat from the bed and so I helped him by holding his arm behind the elbow and below his shoulder." Timothy Hammond testified that he did not have any information as to which photograph in the lineup was the defendant's. He had not been told anything concerning the photographs used in the lineup. He did not attempt to guide his father's hand in making an identification, and when his father's hand moved it was of his own power and volition. He stated that his father made an identification by pointing to the defendant's photograph. Following his father's identification an officer stated the number of the photograph and

asked if that was the number the victim had identified. The victim responded by nodding his head because he was unable to speak. The victim was in the hospital's intensive care unit at the time and was very ill. He died at 2:52 p.m. on the following day— 8 February 1984.

Dr. James Parker, an expert in the field of forensic pathology, testified that he performed an autopsy on the victim. In his opinion, the victim died of pneumonia. He testified that there was a direct relationship between the gunshot wound and the pneumonia. He testified that the wound the victim sustained "compressed and damaged his spinal cord to the point that . . . he was paralyzed from the waist down and . . . this, of course, rendered him immobile . . . ." Further, the victim had blood clots in his lungs that became infected and caused the pneumonia. Dr. Parker stated that, "there was a direct relationship from the injury to the spinal cord, his being immobile, the throwing of blood clots, they were all secondary to the gunshot."

The defendant presented evidence after the State rested. Dr. Fred Owens testified that on 14 January 1984, he examined the victim and found him to be extremely short of breath. He determined that this was because a blood clot had moved from his lower extremities into his lung. He testified that the victim was making good progress towards recovering from the gunshot wound "but still had potential complications from that injury."

Dr. Johannes Kystra testified as an expert in the field of internal medicine and pulmonary diseases. He testified that he had examined the medical records of the victim along with other reports including the autopsy report. From a review of all the medical records and reports he stated that he "came to the conclusion that the immediate cause of death as it was described in the medical records was with no doubt pneumonia." Further, he testified "that it was impossible to see a direct cause and effect relationship" between the gunshot wound and the victim's death.

By his first assignment of error the defendant contends that the trial court erred in allowing the State to introduce a video tape recording of the victim's out of court identification of the defendant in a photographic lineup. The defendant argues that the photographic lineup was impermissibly suggestive and, therefore, violated his due process rights.

Following a *voir dire* examination of Officer Lafone and Timothy Hammond, the trial court reviewed the transcript of a suppression hearing involving this evidence which had been held on 13 August 1984. The trial court concluded that, "as to the February 7, 1984, video tape, the court finds . . . [t]hat the display of the photographic lineup was not so unnecessarily suggestive as to violate the due process right of the defendant and that the same is admissible."

Without question "[i]dentification procedures which are so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification violate a defendant's right to due process." *State v. Grimes*, 309 N.C. 606, 609, 308 S.E. 2d 293, 294 (1983). Further, "[t]his Court has said that to determine the suggestiveness of pretrial identification, the test is whether the totality of circumstances reveals a pretrial procedure so unnecessarily suggestive and conducive to irreparable mistaken identity as to offend fundamental standards of decency and justice." *Id.*

After a review of the above principles, we find no error in the trial court's conclusion that the pretrial identification procedure was not so impermissibly suggestive as to violate the defendant's right to due process. The trial court's findings are supported by competent evidence in the record and are therefore conclusive on appeal. *State v. Taylor*, 280 N.C. 273, 279, 185 S.E. 2d 677, 681 (1972). The findings support the trial court's conclusion. We also note that each member of this Court has viewed the video tape of the victim's identification of the defendant, and we find nothing impermissibly suggestive about the procedure actually used.

The defendant also argues that the video tape recording procedure violated his sixth amendment right to counsel. This argument is clearly erroneous. The defendant had no constitutional right to counsel during the photographic lineup. *State v. Carson*, 296 N.C. 31, 38, 249 S.E. 2d 417, 422 (1978).

[1] The defendant next argues that the video tape recording of the victim's identification of him amounted to inadmissible hearsay. After hearing the evidence presented on *voir dire* and considering the transcript of testimony presented at the suppression hearing in the case *sub judice*, the trial court found that "as to

the February 7, 1984, video tape . . . the procedure was at the time when the deceased knew or had [a] reasonable belief . . . that his death was imminent." The trial court admitted the video tape and the victim's statements at the time it was made as dying declarations.

The video tape and the testimony as to what the victim said during the photographic identification on 7 February 1984 are hearsay. The question before this Court is whether they were properly admitted as dying declarations.

Dying declarations have long been admissible as exceptions to the hearsay rule in North Carolina. *State v. Hamlette*, 302 N.C. 490, 495-96, 276 S.E. 2d 338, 342 (1981). For a dying declaration to be admissible the declarant must be unavailable as a witness at trial and his statement must have been a "statement made by a declarant while believing that his death was imminent, concerning the cause or circumstances of what he believed to be his impending death." N.C.G.S. § 8C-1, Rule 804(b)(2) (Cum. Supp. 1985).

Delores Whittington testified that she heard a nurse ask the victim several days before he died if he knew he was dying, and that he responded affirmatively. Further, Whittington testified that the subject of death had arisen before and that the victim had told her "many times that he knew that he would not return home." The evidence presented at the motion hearing showed that at the time the victim identified the defendant, the victim was in a hospital bed in an intensive care unit, was attached to a ventilator, and was being fed through tubes running through his nose and into his stomach. The victim gave the statement at issue on 7 February 1984 and died the next day.

We cannot say that the trial court erred by admitting the video tape and statements made by the victim on 7 February 1984 as dying declarations. At the time of trial the victim was dead and, therefore, unavailable to testify. The evidence clearly supports the trial court's finding that when the victim identified the defendant on 7 February 1984, he believed his death was imminent. The victim's statement obviously concerned the cause or circumstances of his impending death. This assignment is without merit.

The defendant next argues that the admission of the victim's dying declarations violated the sixth amendment to the Constitu-

tion of the United States which guarantees an accused "the right . . . to be confronted with the witnesses against him." This contention is without merit. *State v. Stevens*, 295 N.C. 21, 31-33, 243 S.E. 2d 771, 777 (1978).

The defendant also argues that the evidence at issue was inadmissible because "its probative value [was] substantially outweighed by the danger of unfair prejudice . . . ." N.C.G.S. § 8C-1, Rule 403 (Cum. Supp. 1985). Unfair prejudice is defined as "an *undue* tendency to suggest decision *on an improper basis*, commonly, though not necessarily, an emotional one." *State v. Mason*, 315 N.C. 724, 731, 340 S.E. 2d 430, 435 (1986) (emphasis added). The evidence in question, however, could only be viewed as having a *due* tendency to suggest a decision on a *proper basis*. Whether to exclude evidence under Rule 403 is a matter within the sound discretion of the trial court. *Id.* "A trial court may be reversed for abuse of discretion only upon a showing that its ruling was manifestly unsupported by reason and could not have been the result of a reasoned decision." *State v. Riddick*, 315 N.C. 749, 756, 340 S.E. 2d 55, 59 (1986). We find no abuse of discretion by the trial court in allowing the admission of evidence concerning the victim's dying declaration.

[2] The defendant next assigns as error the trial court's actions in admitting testimony concerning other statements by the victim, before he knew of his impending death, in which he identified the defendant as the person who shot him.

N.C.G.S. § 8C-1, Rule 804, which became effective 1 July 1984 provides, *inter alia*:

(b) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . .

(5) Other Exceptions. A statement not specifically covered by any of the foregoing exceptions [for former testimony, statements under belief of impending death, statements against interest and statements of personal or family history] but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the state-

ment is more probative on the point for which it is offered than any other evidence which the proponent can produce through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it gives written notice stating his intention to offer the statement and the particulars of it, including the name and address of the declarant, to the adverse party sufficiently in advance of offering the statement to provide the adverse party with a fair opportunity to prepare to meet the statement.

N.C.G.S. § 8C-1, Rule 804(b) (Cum. Supp. 1985). In *State v. Triplett*, 316 N.C. 1, 340 S.E. 2d 736 (1986), this Court established guidelines for the admission of hearsay testimony under Rule 804(b)(5); however, those guidelines "apply only to those cases in which the trial begins after the certification date of this opinion." *Id.* at 9-10, 340 S.E. 2d at 741. The guidelines announced in *Triplett* do not apply here because the trial in the case *sub judice* commenced on 25 February 1985, and the opinion in *Triplett* was certified on 18 February 1986.

In *Triplett* we stated that in cases to which the guidelines shall not apply because the trial was commenced before that opinion was certified, "the appellate courts will examine each appeal on a case-by-case basis to determine whether the ruling of the trial judge admitting or excluding evidence under Rule 804(b)(5) may be sustained based on the contents of the record on appeal." *Id.* at 10, 340 S.E. 2d at 741. We have examined each of the statements of the victim implicating the defendant. We conclude, based on an examination of the record, briefs, and transcript, that the statements of the victim had the required "circumstantial guarantees of trustworthiness" under Rule 804(b)(5) and that testimony concerning them was properly admitted.

In weighing the "circumstantial guarantees of trustworthiness" under Rule 804(b)(5) it is appropriate to consider among other factors (1) assurances of the declarant's personal knowledge of the underlying events, (2) the declarant's motivation to speak the truth or otherwise, (3) whether the declarant has ever recanted the statement, (4) the nature and character of the statement,

and (5) the relationship of the parties. *State v. Triplett*, 316 N.C. at 10-11, 340 S.E. 2d at 742. In the present case, the personal knowledge of the victim is obvious. Nothing in the record on appeal tends to show that the victim had any motivation to tell anything other than the truth to those investigating the shooting. From the moment he was found until his death, the victim never wavered in his identification of the defendant as the man who shot him. Additionally, all information contained in the statements complained of was corroborated by the victim's dying declaration or other admissible evidence. There simply is no reason, based upon the record on appeal in this case, to believe that the victim's statements to the police were not truthful. *See generally State v. Triplett*, 316 N.C. 1, 340 S.E. 2d 736 (1986); *State v. Alston*, 307 N.C. 321, 298 S.E. 2d 631 (1983) (decided prior to the adoption of the current Rules of Evidence); *State v. Vestal*, 278 N.C. 561, 180 S.E. 2d 755 (1971) (same). Such statements by the victim implicating the defendant certainly possessed circumstantial guarantees of trustworthiness equivalent to those required under the other hearsay exceptions of Rule 804(b) for former testimony, statements against interest, or statements of personal or family history. The victim's statements had the "equivalent circumstantial guarantees of trustworthiness" necessary to make them admissible in the present case.

[3] To be admissible as "other exceptions" under Rule 804(b)(5), however, it is not enough for the statements to have the required circumstantial guarantees of trustworthiness. The statements must also be offered as evidence of a material fact, be more probative on the point for which offered than any other evidence which the proponent can procure through reasonable efforts, and serve the general purposes of the Rules of Evidence and the interests of justice. The victim's statements identifying the defendant as the man who shot him obviously were offered as evidence of a material fact and more probative on the point than any other evidence which could be procured by reasonable efforts. We also conclude that the admission of the statements of the victim served the general purposes of the Rules of Evidence and the interests of justice. Finally, N.C.G.S. § 8C-1, Rule 804(b)(5) requires that written notice of the State's intention to offer a statement under that rule's provisions for "other exceptions" be given to the defendant in advance of the offering of the statement in evidence.

The record on appeal in this case shows that the District Attorney made it clear at trial that he was seeking to introduce the testimony concerning the victim's statements under the general exception of Rule 804(b)(5). The record on appeal does not reveal an objection by the defendant based upon any failure of the State to comply with the rule's written notice requirement. Neither does the defendant contend on appeal that written notice was not given. Therefore, since the State specifically indicated to the trial court that it was relying *inter alia* on Rule 804(b)(5), and the defendant raised no objection based upon an absence of written notice, it was permissible in this pre-*Triplett* case for the trial court to assume, as do we, that the statutory requirement was met.

The trial court did not err in admitting the testimony of the witnesses concerning the victim's statements to them identifying the defendant as the person who shot him. This assignment of error is without merit.

**[4]** Next, the defendant argues that the trial court erred by permitting the State to introduce statements the defendant made to police officers after he indicated that he wanted an attorney before answering any questions. Officer Lafone testified on *voir dire* that on 24 December 1983, the defendant was in custody and was advised of his Miranda rights. The defendant requested an attorney and was allowed to make telephone calls to contact one; however, he was unable to contact the attorney he desired. While pointing at the warrants the defendant then said: "Who says that I did any of those things." Lafone told the defendant that if he wished to contact an attorney, no one present could talk with him or answer his questions without an attorney present. The defendant then said that he did not want an attorney, signed the waiver of rights form, and gave an inculpatory statement. Lafone testified *inter alia* that the defendant "appeared to be attentive and understood the form and the rights that were read to him." Following the *voir dire* examination of Lafone the trial court concluded that "the defendant's constitutional rights were not violated and that due process was afforded him . . . ."

The defendant assigns error to the trial court's admission of his inculpatory statement into evidence. He contends that his statement was taken in violation of the requirements of *Edwards*

*v. Arizona*, 451 U.S. 477, 68 L.Ed. 2d 378, *reh'g denied*, 452 U.S. 973, 69 L.Ed. 2d 984 (1981). He further contends that the trial court erred by admitting testimony concerning his statement without making specific findings of fact as to whether he waived his rights.

In *Edwards*, the Supreme Court of the United States held that when an accused invokes his right to counsel during custodial interrogation, a valid waiver of that right cannot be established by showing only that he thereafter responded to further police initiated custodial interrogation after being advised of his rights. The Supreme Court stated that in such situations the accused is not subject to further police interrogation until counsel has been made available to him, "unless the accused himself initiates further communication with the police." *Id.* at 484-85, 68 L.Ed. 2d at 386.

In *State v. Lang*, 309 N.C. 512, 521, 308 S.E. 2d 317, 321 (1983), this Court discussed *Edwards* at length and emphasized that it "established 'in effect a prophylactic rule, designed to protect an accused in police custody from being badgered by police officers in the manner in which the defendant in *Edwards* was.' *Oregon v. Bradshaw*, --- U.S. ---, ---, 103 S.Ct. 2830, 2834, 77 L.Ed. 2d 405, 411 (Plurality opinion) (1983)." We emphasized that for this reason, it is "crucial that there be a finding of fact as to who initiated the communication between the defendant and the officers which resulted in his inculpatory statement while in custody and after he had invoked the right to have counsel present during interrogation." 309 N.C. at 521, 308 S.E. 2d at 321-22. We also emphasized that even if the communication with officers was initiated by the defendant, the burden remains upon the State to show a waiver of the right to counsel. *Id.*

In the case *sub judice*, the trial court would have been well advised to make specific findings in detail as to who initiated the conversation between the defendant and Officer Lafone which led to the defendant signing the waiver of rights and making his statement. Nevertheless, the trial court did not commit reversible error in this case by failing to do so. This Court has stated:

> When the admissibility of an in-custody confession is challenged the trial judge must conduct a *voir dire* to determine whether the requirements of *Miranda* have been met

and whether the confession was in fact voluntarily made. The general rule is that the trial judge, at the close of the *voir dire, should* make findings of fact to show the bases of his ruling. If there is a *material* conflict in the evidence on *voir dire* he *must* do so in order to resolve the conflict. If there is no conflict in the evidence on *voir dire*, it is not error to admit a confession without making specific findings of fact, although it is always the better practice to find all facts upon which admissibility of the evidence depends. In that event the necessary findings are implied from the admission of the confession into evidence. If there is a conflict in the evidence which is *immaterial* and has no effect on the admissibility of the confession, it is not error to admit the confession without findings because the purpose of specific findings of fact is to show, for the benefit of the appellate court on review, the factual bases of the trial court's determination of admissibility. Thus, where a conflict in the evidence is immaterial and does not affect the admissibility of the challenged statement, findings are not required, although, again, it is always the better practice to make findings.

*State v. Riddick*, 291 N.C. 399, 408-09, 230 S.E. 2d 506, 512 (1976) (citations omitted). As the thrust of *Edwards* was to provide a brightline procedural rule further insuring that defendants would not be pressured by police to waive their *Miranda* rights, the principles set forth in the foregoing quotation from *Riddick* are equally applicable in cases such as this which involve waivers under *Edwards*.

Officer Lafone's testimony concerning the events surrounding the defendant's inculpatory statement was uncontroverted. No evidence was introduced tending to conflict with his testimony in any way. Officer Lafone's testimony indicated quite clearly and without conflict that after first indicating that he would exercise his right to counsel, the defendant himself initiated further communication and conversations with Lafone and voluntarily waived his rights after they had been fully explained to him. Therefore, "the necessary findings are implied from the admission of the confession into evidence." *State v. Riddick*, 291 N.C. at 409, 230 S.E. 2d at 512. The trial court did not err by concluding that "the defendant's constitutional rights were not violated" and admitting the defendant's statement into evidence.

**[5]** The defendant next argues that the trial court erred by allowing the State to introduce a statement that he made to the police after he had retained counsel but without counsel present. The defendant had apparently been released following his arrest on 24 December 1983. On 7 February 1984, the defendant was once again in custody and was being taken to jail. While riding in an elevator with several police officers, the defendant said: "I know what you are doing and it is not going to do you any good. You are not going to find the damn rings." Officer Bryant testified that no one had asked the defendant any questions, nor was any response made to his statement. The evidence in the record before us shows that the defendant's statement was spontaneous and that no interrogation in any form occurred at that time. This assignment of error is feckless. *Edwards v. Arizona*, 451 U.S. at 484-85, 68 L.Ed. 2d at 386. *See generally Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed. 2d 694 (1966).

**[6]** The defendant next argues that the trial court erred in its instructions to the jury on the question of the proximate cause of the victim's death. Before the trial court instructed the jury, the defendant's counsel submitted a request for a particular instruction on the definition of proximate cause. The trial court agreed to instruct the jury on "proximate cause as requested by the defendant in substance." We have reviewed the record and find that the trial court did in fact give the defendant's requested instruction in substance. After the completion of his instructions to the jury, the trial court asked if there was anything further for the defendant. The defendant's counsel specifically objected to several portions of the instructions, but he did not object to the court's instruction on proximate cause or make any further suggestions concerning proximate cause. The defendant therefore waived the right to raise this issue on appeal. N.C. App. R. 10(b)(2). Further, the defendant has shown nothing that even hints that plain error occurred. *See State v. Odom*, 307 N.C. 655, 300 S.E. 2d 375 (1983).

**[7]** By his next assignment the defendant contends that the trial court erred in denying his motion to dismiss the first degree murder charge at the close of all the evidence. The defendant contends that the State's evidence was insufficient to support a finding that the gunshot wound was the proximate cause of the victim's death. This assignment of error is without merit.

At the close of the State's evidence and at the close of all the evidence, the defendant moved to dismiss the charge of first degree murder. In *State v. Riddick*, 315 N.C. 749, 759, 340 S.E. 2d 55, 61 (1986), we recently stated the test for determining whether a motion to dismiss should be granted:

> When a defendant moves under N.C.G.S. § 15A-1227(a)(2) for dismissal at the close of all the evidence, 'the trial court is to determine whether there is substantial evidence (a) of each essential element of the offense charged, or of a lesser offense included therein, and (b) of defendant's being the perpetrator of the offense. If so, the motion to dismiss is properly denied.' The trial court is to view all of the evidence in the light most favorable to the State and give it all reasonable inferences that may be drawn from the evidence supporting the charges against the defendant. 'The trial court is *not* required to determine that the evidence excludes every reasonable hypothesis of innocence prior to denying a defendant's motion to dismiss.' The trial court must determine as a matter of law whether the State has offered 'substantial evidence of all elements of the offense charged so any rational trier of fact *could find* beyond a reasonable doubt that the defendant committed the offense.' (Emphasis added.)

(Citations omitted.)

In *State v. Jones*, 290 N.C. 292, 298, 225 S.E. 2d 549, 552 (1976), this Court said:

> To warrant a conviction for homicide the State must establish that the act of the accused was a proximate cause of death. Criminal responsibility arises only if his act caused or directly contributed to the death. '[T]he act of the accused need not be the immediate cause of the death. He is legally accountable if the direct cause is a natural result of the criminal act.'

(Citations omitted.)

In Dr. Parker's opinion the victim died of pneumonia; however, he testified that there was a direct relationship between the gunshot wound and the pneumonia. He testified that the wound the victim sustained "compressed and damaged his spinal cord to

the point that . . . he was paralyzed from the waist down and . . . this, of course, rendered him immobile . . . ." This condition caused blood clots to form in the victim's lungs. The blood clots became infected and caused pneumonia. Dr. Parker stated, "there was a direct relationship from the injury to the spinal cord, his being immobile, the throwing of blood clots, they were all secondary to the gunshot." Viewing all of the evidence in the light most favorable to the State and giving it all reasonable inferences, we conclude that there was substantial evidence introduced tending to show that the gunshot wound was the proximate cause of the victim's death. This assignment is without merit.

[8] Following the completion of the defense counsel's closing argument, the trial court recessed until the following morning. When court reconvened the defense counsel made a motion to reopen his closing argument to argue a list of twenty-three contentions contained in a writing prepared by the defendant *pro se.* The record shows that the trial court considered each request individually and approved six of the requested contentions and allowed counsel to argue them to the jury. The trial court denied permission to argue the remaining seventeen contentions because he found them to be either unsupported by the evidence presented, improper subjects for jury argument, or repetitious of the defense counsel's arguments made during his closing argument the previous day. The defendant now contends that the trial court abused its discretion when it refused to allow his counsel to argue his remaining contentions to the jury.

Under N.C.G.S. § 84-14 counsel may argue to the jury "the whole case as well of law as of fact." "Trial counsel should be given wide latitude to argue to the jury all of the law and facts presented by the evidence and all reasonable inferences therefrom. But counsel may not travel outside of the record and argue facts not supported by the evidence." *State v. Bruce,* 315 N.C. 273, 283, 337 S.E. 2d 510, 517 (1985) (citations omitted). The arguments of counsel must be left largely to the discretion of the trial court.

The record shows that the trial court in the case *sub judice* reviewed each of the defendant's twenty-three contentions. As to each of the contentions that the trial court refused to allow counsel to argue to the jury, the trial court made specific findings

that they were either unsupported by the evidence or had been argued to the jury the previous day. Upon an examination of the record, transcript, and briefs before us, we cannot say that the trial court abused its discretion.

**[9]**  The defendant next argues that the trial court committed reversible error when it twice denied his motions for the appointment of a pathologist or other medical experts to assist in preparing his defense. In support of his motions at trial the defendant argued that an expert was needed because there was a question as to what caused the victim's death. When the defendant first made his motion for the appointment of a medical expert the trial court denied it "in view of the defendant being furnished a copy of the autopsy report." The second time the defendant made the motion the trial court denied the motion noting that it was a matter within his discretion.

N.C.G.S. § 7A-454 provides that "[t]he court, *in its discretion,* may approve a fee for the service of an expert witness who testifies for an indigent person, and shall approve reimbursement for the necessary expenses of counsel. Fees and expenses accrued under this section shall be paid by the State." (Emphasis added.) N.C.G.S. § 7A-450(b) provides that "[w]henever a person, under the standards and procedures set out in this Subchapter, is determined to be an indigent person entitled to counsel, it is the responsibility of the State to provide him with counsel and the *other necessary expenses of representation.*" (Emphasis added.) *See generally State v. Artis,* 316 N.C. 507, 342 S.E. 2d 847 (1986) (defendant must show particular need).

When applying the statute in *State v. Watson,* 310 N.C. 384, 390, 312 S.E. 2d 448, 453 (1984) we said:

> [T]he Court first recognizes that 'all defendants in criminal cases shall enjoy the right to effective assistance of counsel and that the State must provide indigent defendants with the basic tools for an adequate trial defense or appeal.' We have held, however, that *the state has no constitutional duty to provide an expert witness to assist in the defense of an indigent.* This is a question properly left within the sound discretion of the trial judge. The applicable rule is that expert assistance need only be provided by the state when the defendant can show it is probable that he will not receive a

fair trial without the requested assistance . . . or upon a showing by defendant that there is a reasonable likelihood that it will materially assist the defendant in the preparation of his defense. Mere hope or suspicion that favorable evidence is available is not sufficient.

(Emphasis added) (citations omitted).

Since the decision in *Watson*, however, the Supreme Court of the United States has addressed the issues surrounding the appointment of experts to assist indigent defendants. In *Ake v. Oklahoma*, 470 U.S. 68, 84 L.Ed. 2d 53 (1985), the Supreme Court dealt with the question of whether an indigent defendant was constitutionally entitled to the services of an appointed psychiatrist. We have pointed out that in *Ake*:

The Court stated that three factors were relevant to the resolution of the question: (1) the private interest that will be affected by the State, (2) the governmental interest that will be affected if the expert assistance is to be provided, and (3) the probable value of the assistance that is sought and the risk of an erroneous deprivation of the affected interests if the assistance is not provided. After applying these factors, the Court held that when a defendant makes an ex parte threshold showing to the trial court that his sanity is likely to be a significant factor in his defense, the federal constitution requires the State to provide a psychiatric expert to examine the defendant and to assist in the evaluation, preparation, and presentation of the defense.

*State v. Johnson*, 317 N.C. 193, 344 S.E. 2d 775 (1986) (citations omitted). The Supreme Court explicitly limited the holding in *Ake* to cases in which the defendant made a threshold showing of specific necessity for the assistance of the expert he sought to have appointed by the court. *Id.* This requirement was subsequently reaffirmed in *Caldwell v. Mississippi*, 472 U.S. 320, 86 L.Ed. 2d 231 (1985), "and is consistent with decisions of this Court holding that the denial of a motion for appointment of an expert is proper where the defendant has failed to show a particularized need for the requested expert. *E.g., State v. Artis*, 316 N.C. 507, 342 S.E. 2d 847 (1986)." *State v. Jackson*, 317 N.C. at 1, 343 S.E. 2d at 814.

Application of the factors enunciated in *Ake* leads us to the conclusion that the trial court's denial of the defendant's motions

for the appointment of a pathologist or other medical experts was not error. Although the defendant arguably made a threshold showing of a specific necessity for the assistance of such experts, he was provided with a copy of the autopsy report prepared by Dr. Parker, the pathologist who performed the autopsy on the victim. The defendant has not shown what, if anything, an additional pathologist could have offered in his defense. He has not shown that the failure of the trial court to grant his motions deprived him of a fair trial or that he would have been materially assisted in the preparation of his defense had those motions been granted. To the contrary, the record shows that during the trial, Dr. Kystra, a specialist in pulmonary medicine at Duke Medical Center, and Dr. Fred Owens, a specialist in lung diseases and intensive care, testified for the defense. Their testimony was to the effect that the gunshot wound inflicted upon the victim had not been a proximate cause of his death. The defendant certainly had available and used ample medical expertise in preparing and presenting his defense. The assistance of the experts sought by the defendant clearly would have been of little if any value to him, and there was no risk of an erroneous deprivation of expert assistance as a result of the trial court's denial of the defendant's motions. Therefore, the trial court did not err in denying those motions. *Ake*, 470 U.S. at 77, 84 L.Ed. 2d at 62. It is manifestly apparent that the defendant was not prejudiced in the slightest by the trial court's denial of his motions for the appointment of medical experts to assist him in his defense.

[10] The defendant next contends that the trial court erred when it found his prior convictions to be an aggravating factor when sentencing him for robbery and kidnapping. This contention is without merit. N.C.G.S. § 15A-1340.4(a)(1) (1983).

The defendant also argues that the trial court abused its discretion when it found that this single aggravating factor outweighed the seven mitigating factors found. A trial court may "properly determine that one factor in aggravation outweighs more than one factor in mitigation and vice versa." *State v. Ahearn*, 307 N.C. 584, 596-97, 300 S.E. 2d 689, 697 (1983). The weight to be given mitigating and aggravating factors is a matter solely within the trial court's discretion, and the balance struck by the trial court will not be disturbed if supported by the record. *Id.* The defendant has not shown that the trial court abused its

discretion when weighing the seven mitigating factors against the single aggravating factor in the case *sub judice*. This assignment of error is without merit.

[11]   Next, the defendant argues the trial court erred when it accepted the jury's verdicts. The verdict sheets returned by the jury had the word "yes" in the space provided for the word "guilty" and the date "1 March 1985" in space provided for the words "not guilty." The defendant's counsel objected to the trial court's acceptance of the verdicts in the form presented. The trial court then asked the jury foreman specific questions as to the jury's intent when the verdict sheets were completed. The foreman stated, as to each verdict, that he put the date in the incorrect space and that he meant nothing other than to indicate the date. The entire jury agreed with the foreman. The jury was polled, and each juror individually agreed with the verdicts as submitted.

We stated in *State v. Smith*, 299 N.C. 533, 535-36, 263 S.E. 2d 563, 564 (1980), that "if the verdict substantially answers the issue(s) so as to permit the trial judge to pass judgment in accordance with the manifest intention of the jury, then the verdict should be received and recorded." The verdict forms and the recorded proceedings during and after the return of the verdicts show that the intention of the jury was absolutely and unequivocally clear. No doubtful or insufficient verdicts were received in the case *sub judice*. The trial court properly received the verdicts and entered judgments and sentences accordingly.

Finally, the defendant's brief presents a throng of additional assignments of error which are not supported by argument or authority. We therefore deem them to have been abandoned and neither reach nor decide them. N.C. App. R. 28(a); *State v. Wilson*, 289 N.C. 531, 223 S.E. 2d 311 (1976).

The defendant received a fair trial free from prejudicial error.

No error.