STATE OF NORTH CAROLINA v. JAMES WHITESIDE, JR.

No. 431A88

(Filed 5 October 1989)

1. **Criminal Law § 61.2 (NCI3d) — admissibility of tennis shoes and shoe print comparisons**

    Tennis shoes taken from defendant's residence and expert testimony describing the similarities between shoe prints found at a murder scene and the soles of the tennis shoes were admissible as tending to connect defendant with the alleged murder. Evidence concerning the tennis shoes was not rendered inadmissible by the State's evidence that defendant was wearing boots on the night in question where the State also introduced evidence from which the jury could reasonably infer that defendant wore tennis shoes on that night. N.C.G.S. § 8C-1, Rule 401.

    **Am Jur 2d, Evidence §§ 377, 770, 1145.**

2. **Criminal Law § 416 (NCI4th) — closing argument—refusal to permit excerpts from videotape of accomplices' statements**

    The trial court in a first degree murder case did not abuse its discretion in refusing to permit defense counsel during closing argument to show excerpts of the videotaped confessions of two accomplices who testified for the State where the entire videotape was shown to the jury during the trial, and defense counsel was permitted to refer extensively to the videotape during his closing argument and to contrast it with the testimony of the witnesses. N.C.G.S. § 15A-1230(a), § 84-14.

    **Am Jur 2d, Trial § 197.**

**3. Criminal Law § 89.10 (NCI3d) — State's witness — exclusion of juvenile adjudications**

The trial judge in a homicide case did not abuse his discretion in refusing to admit into evidence the juvenile adjudications of a State's witness after he had allowed the adjudications to be used on cross-examination for impeachment purposes. N.C.G.S. § 8C-1, Rule 609(d).

**Am Jur 2d, Witnesses § 575.**

**4. Homicide § 12 (NCI3d); Assault and Battery § 17 (NCI3d) — indictment for murder — insufficiency to support assault convictions**

An indictment charging that defendant "unlawfully, willfully and feloniously and of malice aforethought did kill and murder" a named victim is insufficient to support a verdict of guilty of assault, assault inflicting serious injury or assault with intent to kill. Therefore, the trial court did not err in refusing to submit potential assault verdicts to the jury. N.C.G.S. § 15-169, § 15-170.

**Am Jur 2d, Homicide § 535.**

**5. Constitutional Law § 28 (NCI3d) — knowing use of false testimony for conviction — insufficient proof by defendant**

The trial court properly denied defendant's motion for a mistrial in a murder case on the ground that the State knowingly used false testimony to obtain his conviction because the statements made by two accomplices to the police were inconsistent with their testimony at trial where the variations in testimony noted by defendant related to actions of the accomplices rather than of defendant and were not material to establishing defendant's guilt, and defendant failed to show that the accomplices' testimony was false concerning defendant's actions.

**Am Jur 2d, Criminal Law § 784.**

**6. Criminal Law § 794 (NCI4th) — instruction on acting in concert — supporting evidence**

The trial court did not err in instructing the jury that it could find defendant guilty of first degree murder on a theory of acting in concert, even if participation by defendant's two accomplices in the crime was not equal to that of defend-

STATE v. WHITESIDE

[325 N.C. 389 (1989)]

ant, since the presence of the accomplices at the crime scene and evidence that they committed actions which furthered the criminal act upon the victim combined to show a common plan or purpose among the three men.

**Am Jur 2d, Homicide § 507.**

7. **Criminal Law § 43 (NCI4th) — acting in concert — simultaneous action and equal participation not required**

Neither simultaneous action nor equal participation in the commission of a crime by two persons is a prerequisite for application of the theory of acting in concert.

**Am Jur 2d, Criminal Law § 166; Homicide § 29.**

8. **Constitutional Law § 32 (NCI3d); Criminal Law § 568 (NCI4th) — same attorney representing accomplices — artificial conformity of testimony — defendant not prejudiced**

The trial court did not err in refusing to sever the joint representation of defendant's two accomplices by the same retained attorney and in denying defendant's motion for a mistrial on the ground that the joint representation created a conflict of interest between the attorney and the public's interest in the fair administration of justice due to the "artificial conformity" of the testimony of the two accomplices after they retained the same attorney where most of the testimony defendant alleged was "artificially conformed" related to actions of the accomplices rather than of defendant, and defendant failed to show that the potential conflict of interest prejudiced his rights.

**Am Jur 2d, Criminal Law §§ 754-757.**

Justice MITCHELL dissenting.

Justices WEBB and WHICHARD join in this dissenting opinion.

APPEAL by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered 24 May 1988 by *Sitton, J.,* in Superior Court, BUNCOMBE County, upon a jury verdict of murder in the first degree. Heard in the Supreme Court 11 May 1989.

*Lacy H. Thornburg, Attorney General, by David F. Hoke, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Daniel R. Pollitt, Assistant Appellate Defender, for defendant-appellant.*

FRYE, Justice.

Defendant was charged under a true bill of indictment with the murder of Gary Cooper and convicted of murder in the first degree in violation of N.C.G.S. § 14-17. The jury recommended life imprisonment, and from the judgment imposing a sentence of life imprisonment, defendant appeals to this Court. We find no prejudicial error.

The testimony presented to the jury in this case reveals a brutal sequence of events. The State's evidence tended to show that on the evening of 29 October 1987, Gary Cooper and approximately thirty-five others were celebrating a wedding at a liquor house on Gudger Street in Asheville. Gertrude Gardner operated the liquor house and saw Cooper when he arrived. On the morning of 30 October 1987, Ms. Gardner discovered Cooper's body in a field adjacent to the house and telephoned police. In response to Ms. Gardner's call, Don Babb of the Asheville Police Department was dispatched to the field adjacent to the house on Gudger Street. He observed a "partially-nude body of a white male" which "[a]ppeared to be that of a dwarf or a midget." The victim's shirt was bloody, there was dried blood in the victim's hair, one hand was underneath the head and there were gashes on the victim's leg. There were various items of clothing, a wallet and an abandoned vehicle near the body. Detective Van Smith arrived at the crime scene and recognized the body as that of Gary Cooper whom he had known for years.

Lieutenant William Gibson of the Asheville Police Department collected the following items from the field where the victim's body was found: a driver's license for Gary Cooper, a pair of blue jeans, a plaid shirt, a pair of boots, an aluminum bell housing, a steel transmission gear, a brick, and the trunk lid of a 1969 Pontiac. The aluminum bell housing was a few feet away from the victim's body and the trunk lid, which had tennis shoe prints on it, was found next to the victim's body.

Derrick Penland testified that he was present at the Gudger Street liquor house on the evening of 29 October 1987 along with

defendant James Whiteside, Marvin Brown, James Brown, Coleman Clark and Lamont Robinson. While in a room in the upstairs portion of the house, Penland saw defendant strike Cooper in the head with his fist. Cooper remained unconscious on the floor for approximately thirty minutes after which he went outside. Defendant, James Brown and Lamont Robinson also went outside. When defendant, Brown and Robinson returned, Penland overheard each of them say "[t]hey all beat . . . and pile drived" Cooper. Penland testified on cross-examination that defendant was wearing gray boots on the night in question.

Adrian Lyles, also present at the liquor house on the evening in question, noticed a cut above Cooper's eye. When she asked why Cooper was bleeding, defendant told her that he had hit Cooper. Lyles testified that she went downstairs and upon her return noticed that Cooper was "knocked out flat on the floor." Defendant stated to her that "he hit him again."

On 30 October 1987, Lamont Robinson and James Brown were arrested for breaking into a car and larceny — charges unconnected with the present case. After both men were released on bond, they were picked up again that evening for questioning concerning the death of Cooper. Both men were informed of their rights; both waived their rights and wrote voluntary statements.

Robinson eventually pleaded guilty to the second degree murder and common law robbery of Cooper, two counts of breaking or entering, and two counts of larceny. A post-arrest statement taken from Robinson was substantially the same as the testimony of other witnesses regarding the events that occurred at the liquor house. Robinson testified that when Cooper regained consciousness and left the liquor house, he remained inside while defendant, James Brown, Marvin Brown, and Coleman Clark followed the victim outside. The group of men returned approximately five minutes later. After about twenty minutes, defendant went back outside "to finish him [Cooper] off." Robinson and James Brown went outside "to see what he [defendant] was going to do." Robinson stated that he saw the victim "laying face down" in the field. Robinson demonstrated to the jury, using a doll the same size as the victim, the manner in which defendant "pile drived" the victim. His demonstration showed that defendant held the victim upside down with his head between defendant's knees. Robinson further testified that defendant "pile drived him onto his head about three times"

onto a glass bottle. He also testified that defendant "got up on the car and jumped off onto his [the victim's] neck" three times and that defendant took a "bell housing" and threw it on the victim's head. Robinson further testified that he did not kill Cooper but only kicked him several times to see if he was alive. Defendant, Robinson and others later robbed a nearby grocery store and stole beer.

James Brown also gave a voluntary written statement to police similar to Robinson's statement and to the testimony of other witnesses. At trial Brown testified that after the group of men followed Cooper outside, he saw defendant throw the victim off the porch of the house "by his legs" onto a stump. Sometime later the same group of men, including defendant and Brown, went over to the victim and carried him to the side of the house. Robinson and Brown checked the victim's clothing for money. Brown testified that the victim was still alive when the group left him. Brown's testimony corroborated that of Robinson regarding defendant's "pile driving," jumping off the hood of the car onto the victim, and throwing the "bell housing" onto the victim. He also testified that he did not murder the victim. Brown pleaded guilty to second degree murder, common law robbery, two counts of breaking or entering, and two counts of larceny.

Jessica Penland, defendant's girlfriend, testified at trial that defendant lived in her home. She identified a pair of pants defendant wore on the night in question and a pair of Nike tennis shoes frequently worn by defendant. The pants and tennis shoes were taken into custody by the police from her home following defendant's arrest.

John Neuner, a State Bureau of Investigation expert in latent evidence, testified that an examination of the automobile trunk lid found beside the victim's body revealed four footwear impressions of sufficient detail for comparison purposes. The agent further testified that the impressions were made by tennis shoes; the sole design, size and wear characteristics of the impressions were consistent with the tennis shoes in question. The agent concluded that although he could not say positively that the tennis shoes in question made the impressions, there was nothing about the shoes that would cause him to eliminate them as being the shoes that made the impressions.

Lucy Milks, a State Bureau of Investigation forensic serologist, testified that bloodstains on pants taken from Jessica Penland's

home were consistent with the victim's blood. Both defendant's coat and a brick found at the scene contained human blood. Ms. Milks further testified that she did not find any blood on the bell housing and that she found a very small bloodstain which she could not test on the right Nike tennis shoe seized from Penland's home.

Deborah Radisch, a medical examiner, performed an autopsy on the body of Cooper on 31 October 1987. She testified that Cooper was four feet, four inches tall, weighed 110 pounds (an "achondroplastic dwarf") and had a blood alcohol content of .27 percent. She further testified that Cooper's death was caused by a combination of all the injuries consistent with blunt-force type injury and asphyxia (suffocation). There were numerous abrasions all over the body and the head: a cut over the left eyebrow; a deep cut on the back of the head; lacerations on the inside and the outside of the lips; a tooth had been knocked out; small hemorrhages on the whites of the eyes; hemorrhages, bruising and bleeding in some neck muscles; a skull fracture; and a blood clot on the right side of the brain. In response to a hypothetical question, Radisch responded that in her opinion if a person of defendant's size had jumped three or four times from a car onto the neck of the victim, the injuries would have been more severe than those found on the body of Cooper. Dr. Radisch also testified that Cooper's head injuries were not consistent with the type of injuries expected if a person fell and hit his head on a broken bottle. She also testified that Cooper's hemorrhaging and neck muscle injuries were more consistent with manual strangulation even though she found no actual evidence that he had been strangled.

Defendant testified at trial that he went to the Gudger Street liquor house on the night in question and was in an upstairs room listening to headphones when Cooper entered and said "cut that music off." Cooper then came up and pushed defendant in the face and asked "did you hear what I said?" Cooper knocked the radio from the table and the headphones from defendant's head. Defendant struck Cooper after Cooper charged him with his head and got blood on defendant's pants. Defendant's testimony was consistent with the testimony of the other witnesses concerning the activity of Cooper and defendant inside the house. However, defendant testified that he did not jump off an automobile onto Cooper, did not "pile-drive" Cooper, and did not hit him with a bell housing. Defendant testified to the overall number of blows

he inflicted, stating, "I hit him above the eye, I kicked him twice, and I flipped him off the porch." Defendant also testified that he did not kill Cooper and that he was wearing his gray boots on the night in question.

Defendant introduced evidence concerning the tennis shoes in the form of the testimony of Haywood Starling, a former SBI agent, an expert in latent evidence. Starling compared the soles of the tennis shoes introduced into evidence with the footwear impressions on the trunk lid and concluded that the shoes "may have made some of the tracks, if not all of the tracks, or . . . the shoe prints on the hood may have been made [by] any other pair of shoes containing an identical design." Starling further testified that eleven or twelve different lines of Nike shoes have identical "concentric-circle" designs on their soles.

As a part of his case, defendant played before the jury the videotaped statements of Lamont Robinson and James Brown. Coleman Clark and Marvin Brown, also charged with the first degree murder of Cooper, were called by defendant as witnesses. Both Clark and Brown, through their attorneys, asserted their fifth amendment privileges against self-incrimination. Both invoked the privilege in response to defendant's questions.

The jury was permitted to consider possible verdicts of first degree murder, second degree murder, voluntary manslaughter, involuntary manslaughter or not guilty. The court rejected defendant's request to submit a possible verdict of assault inflicting serious injury. The jury returned a verdict of guilty of first degree murder. At the sentencing phase of the trial, the jury found that the murder was especially heinous, atrocious or cruel, and that defendant either delivered the fatal blows which caused the victim's death or, while acting in concert with others, attempted to kill, intended to kill, or contemplated that the life of Gary Cooper would be taken. While rejecting thirteen submitted mitigating circumstances and finding the existence of four, the sentencing jury failed to find beyond a reasonable doubt that the mitigating circumstances found were insufficient to outweigh the aggravating circumstance. Upon the unanimous recommendation of the jury, the court sentenced defendant to a term of life imprisonment. Defendant appeals to this Court as a matter of right pursuant to N.C.G.S. § 7A-27(a).

[1] Defendant argues seven assignments of error. He first contends that the trial court erroneously admitted into evidence both

the tennis shoes and the testimony regarding the footwear impressions found at the scene and erroneously denied defendant's motion in limine to preclude expert testimony concerning the footwear impressions, his motion to strike the introduction of the tennis shoes, and his motion for a mistrial. Defendant contends that all of this evidence was irrelevant and failed to connect defendant with the crime. Defendant further contends that the evidence failed to show when the footwear impressions were made or that they were made by the defendant.

N.C.G.S. § 8C-1, Rule 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1988). Evidence is relevant if it has any logical tendency, however slight, to prove a fact in issue in the case. *State v. Wingard*, 317 N.C. 590, 346 S.E.2d 638 (1986). Evidence of footprints or shoe prints at the scene of the crime corresponding to those of the accused is admissible as relevant circumstantial evidence tending to connect an accused with the crime. *State v. Bullard*, 312 N.C. 129, 322 S.E.2d 370 (1984). However, the inference to be drawn from the evidence must be reasonable. *State v. Atkinson*, 298 N.C. 673, 259 S.E.2d 858 (1979). "[E]very circumstance that is calculated to throw any light upon the supposed crime is admissible. The weight of such evidence is for the jury." *State v. Hamilton*, 264 N.C. 277, 286-87, 141 S.E.2d 506, 513 (1965), *cert. denied*, 384 U.S. 1020, 16 L.Ed. 2d 1044 (1966).

Defendant contends essentially that the evidence about footwear impressions (shoe prints) and tennis shoes was irrelevant because all of the State's evidence showed that defendant was wearing boots, not tennis shoes, on the night in question. We reject defendant's contention, however, since the State also introduced evidence from which the jury could draw the reasonable inference that defendant wore tennis shoes on the night in question. While defendant's girlfriend could not remember what shoes defendant was wearing when he arrived at the apartment that night after the incident, she testified that the tennis shoes given to the detective were kept outside the apartment where defendant lived and that they were frequently worn by him. The evidence of the footwear impressions was properly admitted as evidence having a logical tendency to make the fact that the defendant jumped from the hood of the car onto the victim's neck "more probable than it would be

without such evidence." N.C.G.S. § 8C-1, Rule 401 (1988). The tennis shoes and the expert testimony describing the similarities between the footwear impressions and the soles of the tennis shoes, though circumstantial evidence, were admissible as tending to connect defendant with the alleged homicide. Once properly admitted, the weight to be given the evidence was a decision for the jury. We reject defendant's first assignment of error.

[2] By his second assignment of error defendant contends that the trial court erred by refusing to allow defendant to show excerpts of the videotaped confessions of James Brown and Lamont Robinson during closing argument. Defendant introduced the videotaped confessions of Brown and Robinson at trial, and the videotape was admitted into evidence as defendant's Exhibit 10. The tape was played in its entirety to the jury. Defense counsel, by motion, requested permission to reshow portions of the videotaped confessions to the jury during his closing argument. The trial court denied defendant's motion. Defendant contends that the court's refusal to grant the motion entitles him to a new trial. We disagree.

The scope of closing argument is governed by N.C.G.S. § 15A-1230(a) which provides that an attorney may "argue any position or conclusion with respect to a matter in issue." N.C.G.S. § 15A-1230(a) (1988). This statute is in accord with the general rule that counsel is allowed wide latitude in his arguments to the jury. *State v. Hunt*, 323 N.C. 407, 426, 373 S.E.2d 400, 412 (1988); *State v. Holden*, 321 N.C. 125, 362 S.E.2d 513 (1987), *cert. denied*, 486 U.S. 1061, 100 L.Ed. 2d 935 (1988); *State v. Britt*, 288 N.C. 699, 220 S.E.2d 283 (1975). Nonetheless, the permissible scope of counsel's argument to the jury is not unlimited. *State v. Taylor*, 289 N.C. 223, 227, 221 S.E.2d 359, 362 (1976). The trial judge may limit the argument of counsel within his discretion. *Id.* at 226, 221 S.E.2d at 362; *State v. Huffstettler*, 312 N.C. 92, 112, 322 S.E.2d 110, 122 (1984), *cert. denied*, 471 U.S. 1009, 85 L.Ed. 2d 169 (1985).

While it is clear that "the whole case as well of law as of fact may be argued to the jury," N.C.G.S. § 84-14 (1985), and that "counsel is given wide latitude to argue the facts and all reasonable inferences which may be drawn therefrom," *State v. Britt*, 291 N.C. 528, 537, 231 S.E.2d 644, 651 (1977), nevertheless the conduct of arguments of counsel to the jury must necessarily be left largely to the sound discretion of the trial judge. *See State v. Britt*, 291

N.C. 528, 231 S.E.2d 644. In *State v. Penley*, 318 N.C. 30, 347 S.E.2d 783 (1986), for example, this Court held that the trial court did not abuse its discretion in allowing defense counsel to reopen his closing argument to argue six contentions prepared by defendant *pro se* but in denying argument with regard to seventeen other contentions which the court found to be either unsupported by the evidence presented, improper subjects for jury argument, or repetitions of defense counsel's arguments made during his closing argument the previous day.

We find nothing in the record to suggest the trial judge abused his discretion by disallowing the replay of excerpts from the videotape during defendant's closing argument. The two-hour videotape, containing statements of James Brown and Lamont Robinson as they were examined by defendant's attorney, was shown to the jury during trial in its entirety. As such, the videotape was viewed by the jury. The trial judge correctly noted that the videotape would be identical evidence to that previously heard by the jury. As the State notes in its brief, closing argument does not allow counsel to present witnesses to the jury to tell their version of the facts one more time.

Nevertheless, defendant, noting that "counsel's freedom of argument should not be impaired without good reason," *Watson v. White*, 309 N.C. 498, 507, 308 S.E.2d 268, 274 (1983), calls our attention to cases permitting prosecutors to display various items during closing argument: *State v. Oliver*, 302 N.C. 28, 274 S.E.2d 183 (1981) (a revolver); *State v. Holbrook*, 232 N.C. 503, 61 S.E.2d 361 (1950) (a rifle); *State v. Carter*, 17 N.C. App. 234, 193 S.E.2d 281 (1972), *cert. denied*, 283 N.C. 107, 194 S.E.2d 635 (1973) (a cigar box). First, we distinguish such items from a lengthy videotape containing testimony of a witness. Secondly, defense counsel's freedom of argument was not impaired in this case since the judge permitted him to refer extensively to the videotape during his closing argument and contrast it with the testimony of the witnesses. Under these circumstances we find no abuse of discretion.

[3] In his third assignment of error, defendant contends that the trial court erred by refusing to admit the juvenile adjudications of Lamont Robinson into evidence for impeachment purposes. Defendant moved to be given a copy of the juvenile record of the witness Lamont Robinson. The trial judge asked that the record be made available to the court, and upon being informed that de-

fendant had subpoenaed the record, stated that "as soon as the subpoenaed material is available, I will review it and make the determination and rule on your request." The trial judge thereupon ruled that:

> [H]aving considered the matter and having previously received information concerning the probability of the witness, Lamont Robinson, testifying, and there being reference at some earlier time even in a taped recording concerning a juvenile record, and the Court considering the motion under Rule 609(d), the Court finds that the purported record of the witness, Lamont Robinson, would be admissible to attack the credibility as [sic] an adult, and that the Court is satisfied that the admissibility of evidence is necessary for a fair determination of guilt or innocence; that the Court thereby allows the subpoena to be served and the item to be furnished to the Court for an in-camera inspection; that the Court will, thereafter, rule whether or not you may use it. It's hereby ordered that the record be brought to the Court and turned over to the presiding judge.

Defendant made a motion to be provided a copy of Lamont Robinson's juvenile record. The trial judge allowed this motion and before cross-examination of Robinson the trial judge ordered:

> [L]et the record show that at the time the witness was called, the Court at the time called the defense counsel to the bench and handed to them the juvenile file of [Lamont Robinson] which was previously moved by counsel for the defendant that they have access to; that the Court had received the file approximately two minutes before 2 and had not had a chance to review the same, and that after the Court reviewed the matter, the Court tendered the file to counsel for the defendant.

Defendant requested permission to question Robinson concerning the information in the juvenile record, to which the trial judge stated, "Let the record show that the Court will permit it." At the close of defendant's evidence the trial judge denied defendant's motion to introduce the juvenile adjudication orders into evidence. Defendant contends that this was error. We do not agree.

Subsection (a) of Rule 609 provides "[f]or the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime punishable by more than 60 days confinement shall be admitted if elicited from him or established by public record

during cross-examination or thereafter." N.C.G.S. § 8C-1, Rule 609(a) (1988). Juvenile adjudications are governed by subsection (d) of Rule 609 which provides:

> Evidence of juvenile adjudications is generally not admissible under this rule. The court may, however, in a criminal case allow evidence of a juvenile adjudication of a witness other than the accused if conviction of the offense would be admissible to attack the credibility of an adult and the court is satisfied that admission is necessary for a fair determination of the issue of guilt or innocence.

N.C.G.S. § 8C-1, Rule 609(d) (1988). Subsection (d) of Rule 609 first states the general rule that evidence of juvenile adjudications is not admissible and then provides for the admission of the juvenile adjudications of a witness if the offense would be admissible to attack the credibility of an adult *and* the court is satisfied that the admission is necessary for 'a fair determination of guilt or innocence. The final decision rests within the discretion of the trial judge as to whether the admission of the evidence is "necessary for a fair determination of the issue of guilt or innocence." *Id.* The commentary to 609(d) explains that "leeway given the judge is intended to satisfy the requirements of *Davis v. Alaska,* 415 U.S. 308 (1974)." 1 Brandis on North Carolina Evidence § 112 (1988). On cross-examination the defense should be allowed an opportunity to alert the jury that the defense's theory for impeachment is based on a juvenile adjudication of the witness. *Davis v. Alaska,* 415 U.S. 308, 317, 39 L.Ed. 2d 347, 354 (1974). There is no mention that the juvenile convictions are admissible. A fair reading of the trial court's finding that it was satisfied that admission of Robinson's adjudications was necessary for a fair determination of guilt or innocence discloses that this finding related only to the order that the record be brought to the court and turned over to the trial judge. It was not a ruling that the orders were to be admitted into evidence. The trial judge, pursuant to the discretion afforded him in Rule 609(d), allowed the orders to be used on cross-examination for impeachment purposes but denied defendant's request to introduce them into evidence at the close of defendant's evidence.

The admissibility of Lamont Robinson's juvenile adjudications was properly assessed under N.C.G.S. § 8C-1, Rule 609(d), rather than Rule 609(a). While Rule 609(a) is a rule of general admissibility, Rule 609(d), which applies specifically to juvenile adjudications, leaves

admissibility in the trial court's discretion. We find no abuse of that discretion in this case.

[4] Fourth, defendant assigns as error the trial court's refusal to submit to the jury the following as potential verdicts: assault, assault inflicting serious injury, and assault with intent to kill. The bill of indictment charged that defendant "unlawfully, willfully and feloniously and of malice aforethought did kill and murder Gary Lee Cooper." Defendant relies primarily upon N.C.G.S. § 15-169 which provides:

> On the trial of any person for any felony whatsoever, when the crime charged includes an assault against the person, it is lawful for the jury to acquit of the felony and to find a verdict of guilty of assault against the person indicted, if the evidence warrants such finding; and when such verdict is found the court shall have power to imprison the person so found guilty of an assault, for any term now allowed by law in cases of conviction when the indictment was originally for the assault of a like character.

N.C.G.S. § 15-169 (1983).

N.C.G.S. § 15-170, which is also relevant, provides:

> Upon the trial of any indictment the prisoner may be convicted of the crime charged therein or of a less degree of the same crime, or of an attempt to commit the crime so charged, or of an attempt to commit a less degree of the same crime.

N.C.G.S. § 15-170 (1983).

In *State v. Watkins*, 200 N.C. 692, 158 S.E. 393 (1931), Chief Justice Stacy, in a concurring opinion, raised the question of whether a verdict of assault with a deadly weapon is supported by a statutory indictment for murder which fails to allege that the homicide was committed by means of assault and battery or assault with a deadly weapon. Chief Justice Stacy made reference to an earlier version of N.C.G.S. § 15-169 and earlier cases in which it was said that on an indictment for murder the defendant may be convicted of an assault with a deadly weapon or of a simple assault if the evidence warrants such a finding. He noted, however, that "in all of these cases, and others of like import, the observation is carefully made that, to warrant one of the lesser verdicts, assault

with a deadly weapon or simple assault, the crime charged must include an assault against the person as an ingredient." (Citations omitted.) *Id.* at 699-700, 158 S.E. at 397. The question raised by Chief Justice Stacy in *Watkins* was answered by Justice Denny for a unanimous Court in *State v. Rorie*, 252 N.C. 579, 114 S.E.2d 233 (1960). The indictment in *Rorie* charged that defendant "unlawfully, wilfully and feloniously did kill and slay [the victim] against the form of the statute in such case made and provided and against the peace and dignity of the State." *Id.* at 579, 114 S.E.2d at 234. Defendant was convicted of assault with a deadly weapon. On appeal to this Court, the first assignment of error was stated as follows: "Is a verdict of assault with a deadly weapon supported by a statutory indictment for manslaughter which fails to allege that a homicide was committed by means of an assault and battery or assault with a deadly weapon?" After noting the language of N.C.G.S. § 15-169 and N.C.G.S. § 15-170, Justice Denny stated:

> Notwithstanding the provisions of the above statutes, when it is sought to fall back on the lesser offense of assault and battery or assault with a deadly weapon, in case the greater offense, murder or manslaughter, is not made out, the indictment for murder should be so drawn as necessarily to include an assault and battery or assault with a deadly weapon, or it should contain a separate count to that effect.

*Rorie* at 581, 114 S.E.2d at 235. (Citations omitted.) Concluding "that the form of indictment under consideration charges an offense of which assault with a deadly weapon may or may not be an ingredient," the Court concluded that the indictment was "insufficient to cover assault and battery or assault with a deadly weapon as an independent charge, separate and apart from the charge of manslaughter." The Court went on to hold "that the bill of indictment in the present case is insufficient to support a verdict of assault with a deadly weapon . . . ."

In summary, *Rorie* held that an indictment charging that defendant "unlawfully, wilfully and feloniously did kill and slay [the victim]" is insufficient to support a verdict of guilty of assault with a deadly weapon. Likewise, we hold that the bill of indictment in the instant case, which charges that defendant "unlawfully, willfully, and feloniously and of malice aforethought did kill and murder [the victim]" is insufficient to support a verdict of guilty of assault, assault inflicting serious injury or assault with intent to kill. Since

the indictment would not support an assault verdict, the trial judge did not err in refusing to submit potential assault verdicts to the jury.

[5] Fifth, defendant contends that he is entitled to a new trial because the State knowingly used false testimony to obtain his conviction, thus violating his state and federal constitutional rights. Defendant contends that the statements of accomplices James Brown and Lamont Robinson made to police on 30 October 1987 were inconsistent with their testimony at trial. The specific inconsistencies related to Robinson and Brown's complicity in the events leading to the death of Cooper. Defendant also notes that policeman Van Smith testified that shortly before the guilty plea hearing, Robinson changed his account of the events. Defendant's motions for a mistrial based on Robinson and Brown's false testimony and alleged fraud on the court were denied. Defendant contends that the denial of his motion for a mistrial amounted to an abuse of discretion by the trial court.

"In order to prevail on a claim of perjured testimony, defendant must show that the testimony was in fact false, material, and knowingly and intentionally used by the state to obtain his conviction." *State v. Robbins*, 319 N.C. 465, 514, 356 S.E.2d 279, 308, *cert. denied*, 484 U.S. 918, 98 L.Ed. 2d 226 (1987).

We agree with defendant's assertion that the adverse testimony of accomplices should be carefully scrutinized and it is true that "a skeptical approach to accomplice testimony is a mark of the fair administration of justice." *State v. Bailey*, 254 N.C. 380, 388, 119 S.E.2d 165, 171 (1961). However, the fact that the allegedly perjured testimony was given by jointly represented accomplices does not remove defendant's burden of showing that their testimony was both false and material. The inconsistent testimony of Robinson and Brown was not material to establishing the guilt of defendant. The variations in testimony noted by defendant relate to the actions of the accomplices rather than to the actions of defendant. Defendant has not shown that the accomplices' testimony was false concerning defendant's actions nor has he shown how the inconsistent testimony increased the likelihood of his own guilt. Their testimony was subject to rigorous cross-examination by defense counsel. Under these circumstances the trial court did not abuse its discretion by denying defendant's motions for a mistrial.

[6] Sixth, defendant contends that the trial court committed plain error by instructing the jury that it could find the defendant guilty

of first degree murder on a theory of acting in concert. The trial judge instructed the jury in accordance with N.C.P.I. Crim. 202.10. The judge charged the jury that:

> I further instruct you, members of the jury, that for a person to be guilty of a crime, it is not necessary that he himself do all of the acts necessary to constitute the crime. If two or more persons act together with a common purpose to commit first degree murder, or any lesser included offense, considering those in regard to the lesser included offenses, each of them is held responsible for the act of the others done in the commission of the offense.

Defendant contends that the trial court committed error by giving the instruction because there was no evidence of a concert of action in the instant case. Defendant further contends that James Brown and Lamont Robinson played only a marginal role in the assault on Gary Cooper by following defendant out of the house and simply watching defendant as he assaulted Cooper. Defendant argues that if Brown and Robinson did not act in concert with defendant, then the theory of acting in concert cannot be used against defendant.

[7] We reject defendant's argument for the reason that neither simultaneous action nor equal participation in the commission of a crime by two persons is a prerequisite for the application of the theory of acting in concert. In *State v. Joyner*, 297 N.C. 349, 255 S.E.2d 390 (1979), this Court said:

> [w]here the state seeks to convict a defendant using the principle of concerted action, that this defendant did some act forming a part of the crime charged would be strong evidence that he was acting together with another who did other acts leading toward the crimes' commission. That which is essentially evidence of the existence of concerted action should not, however, be elevated to the status of an essential element of the principle. Evidence of the existence of concerted action may come from other facts. It is not, therefore, necessary for a defendant to do any particular act constituting at least part of the crime in order to be convicted of that crime under the concerted action principle *so long as he is present at the scene of the crime and the evidence is sufficient to show he is acting together with another who does the acts necessary to constitute the crime pursuant to a common plan or purpose to commit the crime.*

*Id.* at 357, 255 S.E.2d at 394 (emphasis added). The evidence in the instant case supports an inference that Robinson, Brown and defendant acted together pursuant to a common plan or purpose to kill Cooper. Robinson and Brown's presence at the scene of the crime *and* the evidence that they committed actions which furthered the criminal act upon the victim combine to show a common plan or purpose between the three men. Defendant's contention that Robinson and Brown did not act pursuant to a common plan or scheme rests on the assumption that their sole purpose in attacking Cooper was to rob him. This assumption is ill-founded, however, as the force used by the group of men to rob the victim far exceeded that which would be necessary to subdue an already injured man of considerably lesser physical stature. It was not necessary that Brown and Robinson commit any particular act constituting the crime of first degree murder in order to apply the principle of acting in concert to the defendant. All that was necessary was evidence that all three men acted in some way to pursue the common plan or purpose.

Defendant relies on *State v. Hargett,* 255 N.C. 412, 121 S.E.2d 589 (1960), to show that Brown and Robinson's level of participation in the crime was not enough to establish their responsibility, as a matter of law, under the theory of acting in concert. In *Hargett,* the trial court found that defendant's level of participation did not support a first degree murder charge based on a theory of concert of action where defendant accompanied the perpetrator to a dumpsite; the perpetrator assaulted the victim and pushed him, face down, into a puddle; and the unconscious victim drowned as defendant stood by. This Court found that defendant's presence was not enough to establish responsibility because the defendant neither expressed consent by words or actions nor acted in a manner to contribute to the execution of the crime. 255 N.C. at 415-16, 121 S.E.2d at 591-92.

*Hargett* may be distinguished from the instant case in that the defendant in *Hargett* was sleeping in the back of the automobile driven by the perpetrator when he awoke and saw the perpetrator assault the victim. He protested the assault on the victim but was too intoxicated to take action to prevent the killing. In the instant case, neither Robinson nor Brown protested defendant's acts and their presence at the scene was intentional and voluntary. Both displayed a higher degree of participation than the defendant in *Hargett.* Although Robinson and Brown did not expressly en-

courage defendant, the act of robbing and kicking the victim implied their consent to defendant's felonious purpose and contributed to the execution of the crime as well.

Taken as a whole, the evidence of Brown, Robinson, and defendant's behavior before, during and after the killing is sufficient that a reasonable jury could find that defendant acted in concert with Robinson and Brown to brutally kill Cooper. Thus, we reject defendant's sixth assignment of error.

[8] Defendant contends under his final assignment of error that he is entitled to a new trial because the trial court erroneously denied his motions for inquiry, to resolve conflict of interest, and for a mistrial based on Attorney Bruce Elmore's joint representation of Robinson and Brown. Defendant further contends that the joint representation resulted in "artificial conformity" of their testimony. Defendant alleges that Robinson and Brown's pre-trial statements differed as to the number of times they went outside the liquor house, the events that occurred while outside, whether defendant threw a bell housing onto the victim, whether Robinson checked to see if the victim was dead, and as to the length of time they were in the liquor house before Cooper went outside. After both Brown and Robinson retained Attorney Elmore, however, their statements became more similar and less incriminating of one another. Defendant specifically notes that Robinson admittedly changed his version of the events from his October 1987 statement to the version given at trial.

On 21 March 1988, defendant filed a motion for inquiry regarding the joint representation of Brown and Robinson. Following a hearing held on 21 and 28 March 1988, the trial court denied defendant's motion for inquiry and refused to sever the joint representation. On 9 May 1988, defendant filed a motion to resolve conflict of interest, offering as new evidence the videotaped interviews of Brown and Robinson. The trial court viewed the videotape and subsequently denied defendant's motion. At the close of the state's evidence, defendant made a motion for a mistrial which the trial court denied.

Ordinarily, an attorney may be disqualified for conflicts of interest when the interests of one of two persons, jointly represented by the same attorney, are adverse to the other. This is not the type of conflict of interest alleged in this case. Here, both Brown and Robinson employed the same attorney and neither of them

objects to the joint representation. Nor do they claim any conflict of interest. Instead, defendant argues that the joint representation of Brown and Robinson created a conflict of interest between their attorney and the public's interest in the fair administration of justice due to what he labels as the "artificial conformity" of the testimony of the two accomplices. Defendant further argues that the joint representation precluded him from obtaining a witness who could testify on his behalf since both eyewitnesses were represented by the same attorney.

However, defendant has failed to show prejudice. Defendant's interests are not sufficient to overcome Brown and Robinson's rights to representation by counsel of their choice where defendant fails to show that the potential conflict of interest has prejudiced his rights.

Most of the testimony defendant alleges was "artificially conformed" relates to the actions of the accomplices, rather than defendant's actions. The statement relating to the bell housing did implicate defendant and was made by both Brown and Robinson in all portions of their testimony except Robinson's voluntary, written, post-arrest statement. However, there is no showing that this omission was attributable to an "artificial conformity" rather than other causes such as Robinson's intoxication or stress resulting from the arrest.

We find no fault with the trial judge's handling of defendant's motion to inquire into joint representation of the two accomplices. The trial court held a hearing on defendant's motion for inquiry and questioned Attorney Elmore concerning potential conflicts of interest from joint representation. The court made findings of fact which indicated no conflict in the joint representation of the two accomplices by their chosen attorney. We find no error or abuse of discretion in the actions of the trial court.

We conclude that defendant has had a fair trial, free of prejudicial error. His conviction, and the sentence entered thereon, remain undisturbed.

No error.

Justice MITCHELL dissenting.

Relying upon our decision in *State v. Rorie*, 252 N.C. 579, 114 S.E.2d 233 (1960), the majority concludes that the murder indict-

ment against this defendant in the form prescribed by N.C.G.S. § 15-144 is insufficient to support a verdict for assault, assault inflicting serious injury or assault with intent to kill. As a result, the majority further concludes that the trial court did not err in refusing to submit possible verdicts for any of those lesser offenses.

The majority specifically relies upon a statement in *Rorie*—which I believe was overbroad and *obiter dictum* in that manslaughter case—to the effect that:

> [W]hen it is sought to fall back on the lesser offense of assault and battery or assault with a deadly weapon, in case the greater offense, murder or manslaughter, is not made out, the indictment for murder should be so drawn as necessarily to include an assault and battery or assault with a deadly weapon, or it should contain a separate count to that effect.

252 N.C. at 581, 114 S.E.2d at 235. That statement was influenced, no doubt, by the Court's view that the *manslaughter* indictment before it in *Rorie* charged "an offense of which assault with a deadly weapon *may or may not* be an ingredient." 252 N.C. at 582, 114 S.E.2d at 236 (emphasis added). In my view such statements and supporting reasoning in *Rorie* were wrong at the time that case was decided and have been since overruled—at least implicitly—by this Court's decision in *State v. Weaver*, 306 N.C. 629, 295 S.E.2d 375 (1982).

It is not necessary for an indictment charging a felony to specifically allege the elements essential to a separate indictment for a lesser included offense in order to support a conviction of the lesser included offense. In *Weaver* we stated:

> We do not agree with the proposition that the *facts* of a particular case should determine whether one crime is a lesser included offense of another. Rather, the *definitions* accorded the crimes determine whether one offense is a lesser included offense of another crime. *State v. Banks*, 295 N.C. 399, 415-16, 245 S.E.2d 743, 754 (1978). In other words, all of the essential elements of the lesser crime must also be essential elements included in the greater crime. If the lesser crime has an essential element which is not completely covered by the greater crime, it is not a lesser included offense. The determination is made on a *definitional*, not a factual basis.

STATE v. WHITESIDE

[325 N.C. 389 (1989)]

306 N.C. at 635, 295 S.E.2d at 378-79. Under the clear and firm definitional test set forth in *Weaver*, there simply is no reason—in fact, there never was a reason—for the statement in *Rorie* that a murder indictment must specifically allege necessary elements of the lesser included offenses of assault, assault inflicting serious injury or assault with intent to kill before the murder indictment will support a conviction for such lesser offenses. The murder indictment here charges the defendant with all lesser included offenses, just as though they were set out separately. *State v. Miller*, 272 N.C. 243, 244-45, 158 S.E.2d 47, 48 (1967). Therefore, it also is sufficient to support his conviction for any other offense which *by definition* is a lesser included offense. Assault, assault inflicting serious injury, and assault with intent to kill are lesser offenses included *by definition* in the indictment for murder in the present case. *See id.*

I am also of the opinion that the evidence in the present case of the vicious and prolonged assault by the defendant *and others* upon the victim would support a reasonable finding by the jury that this defendant assaulted the victim with the intent to kill him or assaulted the victim and inflicted serious injury upon him, but that one of the other assailants actually killed the victim. I find no evidence, however, which would support the jury in reasonably returning a verdict for simple assault.

As it is my view that the trial court committed reversible error by failing to permit the jury to consider verdicts for lesser offenses included *by definition* within the murder charged by the bill of indictment and supported by evidence, I conclude that the defendant must receive a new trial. Therefore, I dissent from the decision of the majority.

Justices WEBB and WHICHARD join in this dissenting opinion.