STATE OF NORTH CAROLINA v. ALBERTO GARCIA-LORENZO

No. 9215SC207

(Filed 1 June 1993)

1. **Evidence and Witnesses § 1245.1[1] (NCI4th)— custodial interrogation—no Miranda warnings—public safety exception**

    The trial court did not err in a second degree murder prosecution resulting in an involuntary manslaughter conviction by denying defendant's motion to suppress his statement that he was alone in the car which struck the victim where the statement was made in response to a question from an officer while defendant was under arrest but before he was given his *Miranda* warnings. Based upon the trial court's findings of fact, which are presumed correct because the record does not include the evidence presented at the pretrial hearing and because the evidence presented at trial supported the court's findings, the court concluded that the officer had an objectively reasonable need to protect another from immediate danger or harm and that defendant's statement was not the result of express questioning or words or actions the officer should have known were reasonably likely to elicit an incriminating response from the defendant. Under *State v. Ladd*, 308 N.C. 272, *Rhode Island v. Innis*, 446 U.S. 291, and *New York v. Quarles*, 467 U.S. 649, the question as to whether defendant was alone in the car was not a question protected under *Miranda*.

    **Am Jur 2d, Evidence §§ 555-557, 614.**

    **What constitutes "custodial interrogation" within rule of Miranda v. Arizona requiring that suspect be informed of his federal constitutional rights before custodial interrogation. 31 ALR3d 565.**

2. **Evidence and Witnesses § 1921 (NCI4th)— blood test for alcohol—unconscious defendant—admissible**

    The trial court did not err in a second degree murder prosecution arising from an automobile striking a pedestrian which resulted in an involuntary manslaughter conviction by

---

1. New section pending publication of 1994 supplement.

denying defendant's motion to suppress the results of a chemical analysis of his blood. Defendant was extremely violent on the ride to the hospital and at the hospital; the doctors could not understand defendant's responses to their questions; defendant had a high "index of suspicion" of a head injury and the tests defendant needed could not be conducted while he was combative and thrashing around; the physicians determined that they had to sedate defendant to treat him; and defendant was already unconscious when the officer arrived to obtain the blood sample for chemical analysis so that the officer could not advise defendant of his right to refuse the test. Defendant had no constitutional right to refuse the blood test and could not have "willfully refused" to submit to the test under N.C.G.S. § 20-16.2(c) because he was unconscious and officers did not request that he submit to the test. Although defendant contends that his statutory rights were violated in that he was conscious until he was rendered unconscious and the officers did not give him the right to refuse the test, no evidence exists to show that anyone other than the attending physicians made the decision to render the defendant unconscious, no evidence exists to show that defendant was rendered unconscious for any reason other than to treat him medically, there is no evidence of bad faith on the part of the charging officer, and there was a need to obtain a blood sample before defendant's alcohol level dropped.

**Am Jur 2d, Evidence § 830.**

**Admissibility, weight, and sufficiency of blood-grouping tests in criminal cases. 2 ALR4th 500.**

3. **Homicide § 218 (NCI4th)— second degree murder—victim struck by defendant's car—breathing machine removed—cause of death**

The trial court did not err by not dismissing a charge of second degree murder where the victim was standing on the side of the street talking to people when defendant drove down the street at a high rate of speed, striking the victim and sending his body three or four car lengths down the road; the victim sustained a severe head injury with lacerations on the back of his scalp and was unconscious; he was put on a ventilator; tests showed that he had sustained an injury very high in the spinal column such that the attachment be-

STATE v. GARCIA-LORENZO

[110 N.C. App. 319 (1993)]

tween the head and the upper spinal column had been disrupted; the injury would impede any further movement below the head, as well as any further breathing capabilities; the extent of the injury was discussed with the victim's family and the medical staff and a decision was reached that the situation was not salvageable; the breathing machine was removed with oxygen still being applied; and the victim died in about twenty minutes. There was testimony at trial that nothing could have been done medically to improve the victim's vegetative state, that the doctor personally did not get the victim to follow commands, and that the autopsy showed that the part of the brain that allows people to be awake was "pretty much" destroyed. The victim was a healthy young adult prior to defendant's act and, but for defendant's act, would not have been in this vegetative state and would not have subsequently died.

**Am Jur 2d, Homicide §§ 70, 426.**

4. **Criminal Law § 1098 (NCI4th) — involuntary manslaughter — aggravating factors — great risk of death to more than one person by means of weapon or device normally hazardous to more than one person — not an element of offense**

The trial court did not err when sentencing defendant for involuntary manslaughter arising from an automobile collision with a pedestrian by finding in aggravation that defendant knowingly created a great risk of death to more than one person by means of a weapon or device which would normally be hazardous to the lives of more than one person. Defendant failed to include a transcript of the charge conference or jury instructions and it is presumed that the court instructed the jury properly as to the law arising upon the evidence. The conviction for driving while impaired was arrested and defendant's reckless driving in a neighborhood where he was likely to injure a number of people is not an element of the involuntary manslaughter charge.

**Am Jur 2d, Criminal Law §§ 598, 599.**

Appeal by defendant from judgment entered 20 September 1991 by Judge Donald W. Stephens in Orange County Superior Court. Heard in the Court of Appeals 4 March 1993.

*Attorney General Lacy H. Thornburg, by Assistant Attorney General Linda Anne Morris, for the State.*

*Manuel L. Costa and William M. Sheffield for defendant-appellant.*

ORR, Judge.

This action arises out of an automobile accident involving defendant Alberto Garcia-Lorenzo and a pedestrian Coy Maddry, who is now deceased.

On 1 January 1991, during the early hours of the morning, Officer Troy Smith of the Chapel Hill Police Department observed a Mexican male driving a white Ford Pinto down Franklin Street. As Smith watched the Pinto, he saw the right side wheels bounce off the curb and noticed that the driver was having a hard time controlling the vehicle. Smith followed the car down Rosemary Street, where the speed limit was 25 m.p.h., and observed the Pinto driving on the wrong side of the road at a speed that Smith approximated at 45 m.p.h. Smith followed the Pinto down Rosemary Street where he observed that it continued to accelerate until it disappeared onto the gravel portion of Rosemary. Smith approximated that the Pinto was traveling about 60 to 70 miles an hour before it disappeared onto the gravel.

Lou Griffin lives on the gravel portion of Rosemary, and he was having a New Year's Eve party that night which Coy Maddry attended. At trial, Karcsi Fritz Lehr, another guest at the party, testified that he was standing next to Maddry's car with Maddry when he noticed the Pinto coming over the top of the hill at a high speed. Maddry was talking to people inside of the car, and Lehr was standing toward the back of the car. When Lehr saw the Pinto coming over the hill, he yelled, "Move" and then tried to climb up a wall out of the way of the car. The vehicle struck Lehr, running over his foot and also struck Maddry, sending his body three to four car lengths down the road.

At this time, Officer Smith drove down the gravel road where he noticed Lehr and the other friends of Maddry standing beside a damaged gray car. Smith then proceeded to drive toward a wooded area at the direction of Maddry's friends to find the Pinto. On his way to this area, Smith spotted Maddry lying face down on the road. Smith radioed for help and began emergency treatment

on Maddry. Maddry was subsequently taken to UNC Hospital where he died.

Another officer checked on the Pinto and could not find anyone present at the car. Subsequently, Smith found defendant fifty feet from the Pinto lying on the ground behind a fallen tree. The officers pulled defendant out of the terrain onto the road with ropes and a spine board. Smith then searched the area for additional passengers but found none.

The officers then attempted to transport defendant in an ambulance to the hospital. Officer Porterfield testified that defendant kicked, screamed, and spat blood at the officers the entire ride to the emergency room so that she had to handcuff and restrain him. At the hospital, although defendant continued to kick and scream, one of the physicians asked Porterfield to remove the handcuffs. Once the handcuffs were removed, defendant started hitting Porterfield and the attending physicians, so the hospital security restrained defendant with leather straps. In order to determine whether the officers at the scene needed to continue to look for other victims, Officer Porterfield tried to ask defendant in English whether he was alone in the car. Because it was obvious the defendant spoke Spanish, an attending physician asked the defendant this question in Spanish. Defendant responded to the question by saying, "No, alone" several times. Defendant was then sedated and rendered unconscious so that the doctors could treat him.

Approximately five minutes after defendant was sedated, Officer Hill, a chemical analyst, arrived at the hospital, and Porterfield asked Hill to take blood from the defendant for analysis. Subsequently, at the request of Hill, Dr. Garrison drew two vials of blood from defendant at 3:55 a.m. Hill was unable to read defendant his rights because defendant was unconscious. The results of the analysis showed an alcohol content of 0.1456 grams of alcohol per hundred milliliters of blood.

As to Coy Maddry, Doctor Baker testified that he saw Maddry on this same morning. Baker testified that Maddry had sustained a severe head injury with lacerations on the back of his scalp and that he was unconscious. Maddry had contusions and abrasions over several parts of his body, his arms and chest, and he had severe open wounds and fractures of the lower extremities just below the knees. He was put on a ventilator, and he was never able to breathe on his own again.

Over a six-day period, Baker conducted tests on Maddry. These tests showed that Maddry had sustained an injury very high in the spinal column such that the attachment between the head and the upper spinal column had been disrupted. Baker testified that this injury was of such a high level that it would impede any further movement below the head, as well as any further breathing capabilities. Baker discussed the extent of Maddry's injury with Maddry's family, with members of the medical staff, and with the neurosurgery staff, and on 7 January 1991, a decision was reached that Maddry's situation was not salvageable. At this time, the ventilatory support of the breathing machine was removed with oxygen still being applied in the event Maddry started breathing on his own. In about twenty minutes, Maddry's heart failed, and he died.

On 18 February 1991, defendant was indicted for second degree murder, felonious hit and run, and driving while impaired. In September, 1991, a jury found defendant guilty of driving while impaired, not guilty of felonious hit and run, and guilty of involuntary manslaughter. On 20 September 1991, Judge Stephens arrested the judgment on the driving while impaired charge and, after hearing from both the State and the defendant, imposed a ten-year sentence on defendant for the involuntary manslaughter conviction.

From this judgment, defendant appeals, bringing forth four assignments of error.

I.

[1] First, defendant contends that the trial court committed reversible error by denying defendant's motion to suppress defendant's statement that he was alone in the car. We find no error.

Defendant's sole argument in support of this contention is that this statement was made in response to Officer Porterfield's question asking him if he was alone in the car while he was under arrest and before he was advised of his right to remain silent pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). The State effectively argues, however, that *Miranda* does not apply to exclude defendant's statement in the present case because (1) the statement was not made during an "interrogation", and *Miranda* only applies to "custodial interrogations", and (2) the public safety exception to *Miranda* applies.

The Fifth Amendment requires that statements elicited during a custodial interrogation by law enforcement officers be suppressed unless this questioning was preceded by appropriate warnings and a voluntary and intelligent waiver of the right to remain silent and to have counsel present. *See, Miranda, supra. "Miranda* warnings are not required, however, when a defendant is simply taken into custody. . . . The defendant in custody must also be subjected to *interrogation." State v. Ladd,* 308 N.C. 272, 280, 302 S.E.2d 164, 170 (1983) (emphasis in the original) (citations omitted).

In *Rhode Island v. Innis,* 446 U.S. 291, 301-02 (1980), the United States Supreme Court held:

> A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect . . . amounts to interrogation. (footnote omitted) But, since the police surely cannot be held accountable for the unforseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response. (footnote omitted).

(Emphasis in the original.)

Additionally, in *New York v. Quarles,* 467 U.S. 649 (1984), the Supreme Court created a public safety exception to the requirement that a police officer must give appropriate warnings to a defendant before a custodial interrogation. In *Quarles,* a police officer apprehended and frisked a rape suspect. Upon finding an empty shoulder holster on the suspect, the officer handcuffed the suspect and asked him where the gun was, without advising him of his right to remain silent. The suspect responded, " '[t]he gun is over there.' " *Id.* at 652.

The Supreme Court held that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Id.* at 657. Additionally, the Court stated *Miranda* warnings are not required in a situation where "police officers ask questions reasonably prompted by a concern for the public safety." *Id.* at 656.

In the present case, the trial court held a pre-trial hearing and made findings of fact and conclusions of law on the issue of whether defendant's statement should be suppressed. These find-

ings are conclusive and binding upon an appellate court if they are supported by substantial and competent evidence. *State v. James*, 321 N.C. 676, 685-86, 365 S.E.2d 579, 585 (1988).

After the hearing, the trial court found:

During the examination, Dr. Cohen asked the defendant what his name was in English. The defendant did not respond. Dr. Cohen asked him what his name was in Spanish. The defendant responded "Alberto." Sgt. Porterfield asked the defendant if he was the only person in the car. The defendant did not respond. Sgt. Porterfield asked Dr. Cohen to ask the defendant if there was anybody else in the car with him. When Dr. Cohen asked the defendant if there was anybody else in the car with him in Spanish, the defendant responded, "no, alone." Dr. Cohen asked "only you" in Spanish. The defendant responded, "yes." Dr. Cohen and the officers were concerned that someone else might have been injured in the accident and lying undiscovered at the scene. The defendant was not advised of his Constitution [sic] Rights at any time.

The record on appeal does not include the evidence presented during the pre-trial suppression hearing. "Where the record is silent upon a particular point, the action of the trial court will be presumed correct." *James*, 321 N.C. at 686, 365 S.E.2d at 585. "Therefore, we must assume that the trial court's findings of fact were supported by substantial competent evidence." *Id*. Additionally, assuming that the evidence at trial was the same as the evidence at this pre-trial hearing, our review of the evidence presented at trial showed substantial and competent evidence to support the trial court's findings of fact.

Based on its findings of fact, the trial court concluded that Officer Porterfield had an "objectively reasonable need to protect another from immediate danger or harm" and that the "defendant's statement was not the result of 'express questioning' or 'words or actions the officer should have known were reasonably likely to elicit an incriminating response from the defendant.' " The trial court's findings of fact support these conclusions. Thus, based on the language in *Quarles*, *Ladd*, and *Innis* cited above, Officer Porterfield's question as to whether defendant was alone in the car was not a question which is protected under *Miranda*, and the trial court did not err in denying defendant's motion to suppress

STATE v. GARCIA-LORENZO

[110 N.C. App. 319 (1993)]

his statement in response to this question. Accordingly, we overrule defendant's first assignment of error.

## II.

[2] Next, defendant contends that the trial court erred by denying defendant's motion to suppress the results of the chemical analysis of his blood based on the argument that defendant had made it clear that he wanted to refuse the test pursuant to his rights under N.C. Gen. Stat. § 20-16.2. We find no error.

Defendant argues that his entire course of conduct indicated a negation of any implied consent to a blood test. Further, he argues that because he was conscious before rendered unconscious at the hospital, the manner in which he was disallowed an opportunity to specifically refuse the blood test violated his rights to due process and illegal search and seizure guaranteed by the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution and Article I, Sections 19 and 20 of the North Carolina Constitution.

N.C. Gen. Stat. § 20-16.2 (1989) provides that any person who drives a vehicle on a highway or public vehicular area of this State is deemed to have given consent to a chemical analysis if he is charged with an implied-consent offense. Further, under the statute, the chemical analyst authorized to administer the test must inform him that he has a right to refuse to be tested, both orally and in writing. N.C. Gen. Stat. § 20-16.2(a) (1989). After the person has been informed of his rights under this statute, the charging officer must request the person charged to submit to the type of chemical analysis designated. N.C. Gen. Stat. § 20-16.2(c) (1989). "If the person charged willfully refuses to submit to that chemical analysis, none may be given under the provisions of this section, but the refusal does not preclude testing under other applicable procedures of law." N.C. Gen. Stat. § 20-16.2(c) (1989).

However, if the driver is "unconscious or otherwise in a condition that makes him incapable of refusal," and the charging officer has reasonable grounds to believe that the driver has committed an implied-consent offense, the charging officer may direct the taking of a blood sample from the driver by a person qualified under G.S. § 20-139.1 without notifying the driver of his right to refuse the test. N.C. Gen. Stat. § 20-16.2(b) (1989).

In the present case, the trial court held a pre-trial hearing to determine whether the evidence obtained by the blood test of defendant should be suppressed. As we stated above, these findings are conclusive and binding upon an appellate court if they are supported by substantial and competent evidence. *James, supra.*

After the hearing, the trial court found:

1. During the early morning hours of January 1, 1991, the defendant was arrested and charged with driving while impaired incident to a collision . . . . Sgt. Shauna Porterfield, who was employed as a sworn law enforcement officer with the Town of Chapel Hill, initially saw the defendant as he was being treated for injuries in an ambulance. She accompanied the defendant in the ambulance to UNC Hospitals [sic] because he became extremely violent, fought with the paramedics and tried to free himself from the stretcher. Sgt. Porterfield handcuffed the defendant during the trip to prevent him from fighting in the ambulance. . . .

2. When the defendant arrived at the hospital, he was taken to the Emergency Department and unhandcuffed. The defendant was lying prone on a spine board with a cervical collar on his neck and bleeding profusely from a wound on the right side of his head. . . . When Drs. Tim Cohen and Herbert Garrison, physicians licensed to practice medicine in North Carolina, began examining the defendant, he responded to questions although he could not be understood. The defendant began thrashing, hitting, kicking and spitting at hospital employees requiring restraint by Sgt. Porterfield and hospital personnel.

. . .

4. The defendant had a high "index of suspicion" of a head injury. In determining the nature and extent of any injuries, the physicians needed to have the defendant undergo several tests. These tests could not be conducted while the defendant was combative and thrashing around. The physicians decided to have the defendant paralyzed and summoned anesthesiologists, who sedated him. The defendant lost consciousness for several hours. There were many officers in the department; however, none of them were consulted before the physicians made the decision to paralyze the defendant.

5. After the defendant lost consciousness, Sgt. Porterfield left the examination area. Officer David Hill, a sworn law enforcement officer, arrived at the hospital to administer a chemical test. Officer Hill was certified by the Division of Health Services of the Department of Human Resources as a chemical analyst issued permit number 7166. Sgt. Porterfield advised Officer Hill that the defendant had been arrested and charged with driving while impaired. She requested that Officer Hill perform a chemical analysis by blood test upon the defendant. When Officer Hill went to the area where the defendant was being examined, he found the defendant was unconscious. Officer Hill did not advise the defendant of his rights regarding chemical analysis because he was unconscious. Officer Hill conferred with Dr. Garrison and asked that he collect a blood sample from the defendant for chemical analysis. Dr. Garrison drew blood from the defendant, labelled the sample and gave it to Officer Hill. Officer Hill marked the blood sample, took it to the Chapel Hill Police Department, stored it for the evidence technician and turned it over to the evidence technician for submission for analysis. The defendant did not regain consciousness during the time Officer Hill was present with him.

Again, the record on appeal does not include the evidence presented during this pre-trial suppression hearing. Thus, we must assume that the trial court's findings of fact were supported by substantial competent evidence. *See, James, supra.* Additionally, assuming that the evidence at trial was the same as the evidence at this pre-trial hearing, our review of the evidence presented at trial showed substantial and competent evidence to support the trial court's findings of fact.

Based on its findings of fact, the trial court made the following conclusions of law:

4. The decision to "paralyze" the defendant and, thereby, render the defendant unconscious was a medical decision by physicians treating the defendant solely for his diagnosis, treatment and safety. No officers were involved in this decision in any way.

5. In requesting that Dr. Garrison draw a blood sample for chemical analysis, Officer Hill complied with the requirements of G.S. 20-16.2 and 20-139.1, and the rules and regulations promulgated by the Division of Health Services of the Department of Human Resources.

6. That none of the defendant's state or federal constitutional or statutory rights were violated as contended by the defendant.

Defendant argues the trial court erred in its conclusions and contends that both his constitutional and statutory rights were violated by the admission of the blood sample into evidence. Defendant argues that because he was conscious before rendered unconscious at the hospital, the manner in which he was disallowed an opportunity to specifically refuse the blood test violated his rights to due process and illegal search and seizure guaranteed by the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution and Article I, Sections 19 and 20 of the North Carolina Constitution.

First of all, based on the facts of this case, the defendant had no constitutional right to refuse to submit to chemical analysis. *State v. Howren*, 312 N.C. 454, 456, 323 S.E.2d 335, 337 (1984) (the Legislature has given the right to refuse to submit to chemical analysis as a matter of grace, it is not a constitutional right); *Schmerber v. California*, 384 U.S. 757 (1966) (driver arrested for drunk driving has no federal constitutional right to refuse a compulsory blood test on advice of counsel); See, *State v. McCabe*, 1 N.C. App. 237, 239-40, 161 S.E.2d 42, 44-5 (1968) (breathalyzer test may be administered without first advising the accused that he has a right to refuse the test after he was arrested for driving while intoxicated when there was nothing that "shocks the conscience" or "offends a sense of justice."). Thus, defendant's argument that his constitutional rights were violated by the admission of the blood sample because he was not given the right to refuse the test is without merit.

Defendant's argument that his statutory rights were violated by the admission of the blood sample into evidence when he was not given the right to refuse the test is based on the language found in N.C. Gen. Stat. § 20-16.2(c) (1989). The specific language of this provision states that the charging officer "must request the person charged to submit to the type of chemical analysis designated. If the person charged willfully refuses to submit to that chemical analysis, none may be given under the provisions of this section. . . ." N.C. Gen. Stat. § 20-16.2(c) (1989).

Defendant argues that his "entire course of conduct indicated a negation of any implied consent to a blood test under G.S. 20-16.2." We disagree.

Under N.C. Gen. Stat. § 20-16.2(c), a "willful refusal" is defined as, " 'the declination of a request or demand, or the omission to comply with some requirement of law, as the result of a positive intention to disobey.' " *Mathis v. North Carolina Div. of Motor Vehicles*, 71 N.C. App. 413, 415, 322 S.E.2d 436, 438 (1984) (citation omitted). In the present case, the officers did not request defendant to submit to the chemical test, as he was unconscious at the time of the test; defendant could not, therefore, have "willfully refused" to submit to the test under G.S. § 20-16.2(c).

Defendant also argues, however, that his statutory rights were violated by the officers not giving him the right to refuse the blood test in that he was conscious before rendered unconscious. This Court has held that evidence gained by chemical analysis pursuant to G.S. § 20-16.2 is inadmissible when the defendant is conscious and he is not fully advised of his rights under that statute. *State v. Shadding*, 17 N.C. App. 279, 282-83, 194 S.E.2d 55, 57, *cert. denied*, 283 N.C. 108, 194 S.E.2d 636 (1973); *State v. Fuller*, 24 N.C. App. 38, 40-2, 209 S.E.2d 805, 807-08 (1974). However, when a defendant driver is unconscious, and the charging officer has reasonable grounds to believe the defendant has committed an implied-consent offense, evidence gained pursuant to G.S. § 20-16.2 is admissible without the officer advising the defendant of his rights under the statute. N.C. Gen. Stat. § 20-16.2(b); *State v. Hollingsworth*, 77 N.C. App. 36, 334 S.E.2d 463 (1985).

The facts of the case *sub judice* do not fit squarely under any of these cited cases. The specific facts of this case, as found by the trial court, show that defendant was extremely violent on the ride to the hospital from the scene of the accident and at the hospital once he arrived. Additionally, the doctors could not understand the defendant's responses to their questions. Defendant also had a high "index of suspicion" of a head injury, and the tests defendant needed could not be conducted while he was combative and thrashing around. Thus, the physicians determined they had to sedate defendant to treat him. Defendant was already unconscious when the officer arrived to obtain the blood sample for chemical analysis so this officer did not advise defendant of his right to refuse the test.

Based on these facts, the trial court concluded that defendant was rendered unconscious by the doctors based solely on a medical decision to treat him, that the officers had nothing to do with

STATE v. GARCIA-LORENZO

[110 N.C. App. 319 (1993)]

this decision, and that defendant's statutory rights were not violated in that the officer who conducted the chemical analysis complied with the requirements of G.S. 20-16.2 and 20-139.1. We agree with the trial court's conclusions and find that the facts of the case support these conclusions.

No evidence exists in the record to show that anyone other than the attending physicians made the decision to render the defendant unconscious, and no evidence exists in the record to show that defendant was rendered unconscious for any reason other than to treat him medically. Additionally, there is no evidence of bad faith on the part of Officer Porterfield, the charging officer, for not giving defendant the opportunity to refuse the blood test before he was rendered unconscious, especially in light of the fact that during the period when defendant was conscious, he was extremely combative and hard to control, thrashing, kicking, and spitting, and in light of the fact that the doctors needed to treat defendant as soon as possible and could only do this by rendering him unconscious. The lack of bad faith is further evident in light of the fact that the chemical analyst in charge of obtaining the blood sample had not arrived before the doctors had to render defendant unconscious. Additionally, we must emphasize that the defendant's blood alcohol level would not remain constant and that the need to obtain a blood sample for chemical analysis before the alcohol level dropped is evident.

Thus, based on the specific facts of this case, we hold that defendant's statutory rights were not violated, and accordingly we overrule defendant's assignment of error.

III.

[3] Next, the defendant assigns error to the trial court's denial of his motion to dismiss the charge of second degree murder. We find no error.

In ruling on a motion to dismiss, the trial court must view the evidence in the light most favorable to the State, giving it the benefit of all reasonable inferences which can be drawn therefrom. . . . If there is "substantial evidence" of each element of the charged offense, the motion should be denied. . . . Substantial evidence is that amount of evidence which a reasonable mind might accept as adequate to support a conclusion.

*State v. Rich*, 87 N.C. App. 380, 382, 361 S.E.2d 321, 323 (1987) (citations omitted).

In the present case, defendant contends that the trial court erred by not dismissing the charges of all degrees of homicide against the defendant based on the argument that the State failed to prove beyond a reasonable doubt that the defendant's act was the proximate cause of Coy Maddry's death. " 'Proximate cause is an element of second degree murder *and* manslaughter.' . . . The acts of the defendant must be a real cause, a cause without which the decedent's death would not have occurred." *State v. Holsclaw*, 42 N.C. App. 696, 699, 257 S.E.2d 650, 652, *disc. review denied, appeal dismissed by*, 298 N.C. 571, 261 S.E.2d 126 (1979) (emphasis in the original) (citation omitted).

> To warrant a conviction for homicide the State must establish that the act of the accused was a proximate cause of the death. . . . Criminal responsibility arises only if his act caused or directly contributed to the death. . . . "[T]he act of the accused need not be the immediate cause of the death. He is legally accountable if the direct cause is a natural result of his criminal act."

*State v. Jones*, 290 N.C. 292, 298, 225 S.E.2d 549, 552 (1976) (citations omitted).

In the case *sub judice*, the evidence shows that Coy Maddry was standing on the side of the street talking to people inside of a car, when defendant drove onto that road at a high rate of speed and struck Maddry, sending his body three to four car lengths down the road. A police officer found Maddry lying face down on the road, and the officer radioed for help and began emergency treatment on Maddry. Maddry was subsequently taken to UNC Hospital.

Doctor Baker testified that he saw Maddry at the hospital the same morning he was hit by defendant. Baker testified that Maddry had sustained a severe head injury with lacerations on the back of his scalp and that he was unconscious. Maddry was put on a ventilator, and he was never able to breathe on his own again.

Over a six-day period, Baker conducted tests on Maddry. These tests showed that Maddry had sustained an injury very high in the spinal column such that the attachment between the head and

the upper spinal column had been disrupted. Baker testified that this injury was of such a high level that it would impede any further movement below the head, as well as any further breathing capabilities. Baker discussed the extent of Maddry's injury with Maddry's family, with members of the medical staff, and with the neurosurgery staff, and on 7 January 1991, a decision was reached that Maddry's situation was not salvageable. At this time, the ventilatory support of the breathing machine was removed with oxygen still being applied in the event Maddry started breathing on his own. In about twenty minutes, Maddry's heart failed, and he died.

Defendant argues that his act of hitting Maddry with his car, which sent Maddry's body three to four car lengths down the road and disrupted the attachment between Maddry's head and his upper spinal column, was not the proximate cause of Maddry's death. This argument is based on the testimony of the medical examiner who stated that Maddry was not brain dead and that he could have remained alive on a respirator indefinitely and the testimony of Dr. Baker who stated that some observers felt that Maddry responded to input.

"Brain death", as defined in N.C. Gen. Stat. § 90-323, is not the sole criteria in determining whether a person is dead. The statute states, "This specific recognition of brain death as a criterion of death of the person *shall not preclude the use of other medically recognized criteria for determining whether and when a person has died.*" N.C. Gen. Stat. § 90-323 (emphasis added).

At trial, Dr. Baker testified that in his opinion, Maddry "died from a combination of a very severe head injury with a severe injury to the brain stem, in addition to a severe spinal cord injury." Dr. Baker testified also that nothing medically could have been done to improve Maddry's vegetative state and that Maddry would never have been able to breathe on his own again. Further, Dr. Baker testified that based on the autopsy, "the part of the brain that allows people to be awake was pretty much destroyed" and that he personally did not get Maddry to follow commands.

Maddry was a healthy, young adult prior to defendant's act, and but for defendant's act of hitting Maddry, he would not have been in this vegetative state, unable to breathe on his own or to regain consciousness, and subsequently he would not have died. Thus, we hold that sufficient evidence existed at trial for a jury

to find that defendant's act of hitting Maddry was the direct, or proximate cause of Maddry's death. Based on the evidence presented at trial, viewed in the light most favorable to the State, therefore, we hold that the trial court did not err in denying defendant's motion to dismiss. Accordingly, we overrule this assignment of error.

## IV.

[4] Finally, defendant contends the trial court erred by finding as a factor in aggravation of punishment that the automobile constituted a device knowingly used by the defendant which created a great risk of death to more than one person. We find no error.

Defendant bases his contention on the ground that the factor the court found in aggravation constituted an element of the offense for which defendant was convicted and that N.C. Gen. Stat. § 15A-1340.4 does not allow evidence necessary to prove an element of the offense to be used to prove any factor in aggravation.

In the present case, the trial court found as a factor in aggravation that "the defendant knowingly created a great risk of death to more than one person by means of a weapon or device which would normally be hazardous to the lives of more than one person." Defendant has failed, however, to include a transcript of the charge conference or jury instructions so that this Court could determine what elements the trial court instructed the jury were necessary to convict the defendant of involuntary manslaughter. We must therefore presume the trial court instructed the jury properly as to the law arising upon the evidence as required. *State v. Murphy*, 280 N.C. 1, 7, 184 S.E.2d 845, 849 (1971).

The law arising from the evidence in the present case would require an instruction on the elements of involuntary manslaughter involving a death by vehicle when impaired driving is involved. N.C.P.I., Crim. 206.55A sets out the following jury instruction outlining the elements of such a case:

The defendant has been accused of involuntary manslaughter.

Now I charge that for you to find the defendant guilty of involuntary manslaughter, the State must prove four things beyond a reasonable doubt:

First, that the defendant was driving a vehicle.

Second, that he was driving that vehicle upon a public vehicular area within the state.

Third, that at the time the defendant was driving that vehicle he had consumed sufficient alcohol that a chemical analysis made at any relevant time after the driving showed the defendant to have an alcohol concentration of 0.10 or more grams of alcohol per 100 milliliters of blood. A relevant time is any time after the driving in which the driver still has in his body alcohol consumed before or during the driving.

And fourth, that the impaired driving by the defendant proximately caused the victim's death. Proximate cause is the real cause, without which the victim's death would not have occurred.

In the case *sub judice*, the defendant was convicted of driving while impaired, which conviction the trial judge arrested as an element of the involuntary manslaughter conviction. Defendant's reckless driving of his automobile in a neighborhood where he was likely to injure a number of people is not an element of the involuntary manslaughter charge. Accordingly, we overrule defendant's final assignment of error.

No error.

Judges WELLS and MARTIN concur.