STATE OF NORTH CAROLINA v. GARY G. GILREATH

No. 9321SC1224

(Filed 21 March 1995)

**1. Homicide § 220 (NCI4th)— voluntary manslaughter—gunshot as proximate cause of death—sufficiency of evidence**

In a prosecution of defendant for voluntary manslaughter, the pathologist's testimony that the cause of death "all began with the bullet wound" was sufficient evidence from which the jury could find that the victim's gunshot wound caused or directly contributed to his death two years later, whatever complications may have arisen as a result of later surgery which the victim had against medical advice and did not survive.

**Am Jur 2d, Homicide §§ 13-15, 19-21.**

**Necessity of expert testimony to show causal connection between medical treatment necessitated by injury for**

which defendant is liable and allegedly harmful effects of such treatment. 27 ALR2d 1263, supp.

Homicide as affected by lapse of time between injury and death. 60 ALR3d 1323, supp sec. 1.

2. Homicide § 379 (NCI4th)— self-defense—issue properly submitted to jury

The State presented substantial evidence that defendant failed to act in self-defense, and the issue was therefore properly submitted to the jury for its resolution.

Am Jur 2d, Homicide §§ 139, 140, 457.

Homicide: modern status of rules as to burden and quantum of proof to show self-defense. 43 ALR3d 221.

Accused's right, in homicide case, to have jury instructed as to both unintentional shooting and self-defense. 15 ALR4th 983, sec. 1.

3. Arrest and Bail § 82 (NCI4th)— victim's right to detain defendant—sufficiency of evidence

The jury could find that a homicide victim had statutory authority to detain defendant, for purposes of determining whether defendant acted in self-defense in shooting the victim, where the State's evidence tended to show that the victim received a telephone call from his daughter that someone was breaking into her house; the victim saw a strange vehicle in the daughter's driveway; the victim interrupted defendant and another man as they attempted to remove components of an entertainment center in the home; the two men ran from the home; the victim commanded the men to stop and fired a warning shot before he was shot by one of the two men; and the victim was in the direct path of defendant's vehicle. The jury could infer from this evidence that the victim had cause to believe that the felony of burglary was being committed in his presence and that the burglars' vehicle posed a substantial threat of injury to him. N.C.G.S. § 15A-404.

Am Jur 2d, Arrest §§ 34, 35.

Private person's authority, in making arrest for felony, to shoot or kill alleged felon. 32 ALR3d 1078.

**4. Burglary and Unlawful Breaking § 57 (NCI4th)— first-degree burglary—sufficiency of evidence**

Evidence of first-degree burglary was sufficient to be submitted to the jury where it tended to show that defendant entered a home occupied by the victim and her daughter at 1:30 a.m.

**Am Jur 2d, Burglary §§ 44, 45.**

**Sufficiency of showing that burglary was committed at night. 82 ALR2d 643.**

**What is "building" or "house" within burglary or breaking and entering statute. 68 ALR4th 425, sec. 1.**

Appeal by defendant from judgments entered 25 February 1993 by Judge Preston Cornelius in Forsyth County Superior Court. Heard in the Court of Appeals 27 September 1994.

*Attorney General Michael F. Easley, by Assistant Attorney General John J. Aldridge, III, for the State.*

*David F. Tamer for defendant-appellant.*

JOHN, Judge.

Defendant appeals convictions of first degree burglary, felonious larceny, and voluntary manslaughter. He contends the trial court erred by (1) denying his motion to dismiss the charges of voluntary manslaughter and first degree burglary; and (2) denying his request that the lesser offenses of second degree burglary and involuntary manslaughter be submitted to the jury. Upon careful consideration of defendant's arguments, we determine his assignments of error cannot be sustained.

The State's evidence at trial tended to show that in the early morning hours of 4 July 1990, Kay Yokley (Yokley), whose husband was away on business, heard her kitchen door being kicked in. She observed two men moving through her house, walking from room to room. However, she was able to pick up her eighteen month old child and escape through the kitchen without being seen by the men. While leaving, she grabbed a cordless telephone and subsequently called her mother, Margaret Wall (Mrs. Wall), telling her someone had broken into the house and to call the police. Because the call was disconnected, Mrs. Wall apparently did not hear the latter portion of the conversation requesting that the police be notified. Yokley then went to a neighboring house and telephoned the authorities as well.

Yokley's parents, upon hearing someone was breaking into their daughter's home, immediately drove to her residence. Mr. Wall (Wall) brought a .22 caliber semi-automatic rifle with him. Upon arriving, the Walls noticed a truck in the driveway and parked directly behind it. Mrs. Wall entered the house and screamed for her daughter upon confronting two men, identified by her as defendant and his co-defendant David Bumgarner (Bumgarner), working at disconnecting components of an entertainment center. The two then ran from the dwelling while Mrs. Wall looked for her daughter and granddaughter.

Mrs. Wall then heard her husband yell, "stop, stop. If you don't, I'm going to shoot," followed by one gunshot and then a "whole bunch" of gunshots. When she next saw Wall, he was standing in the carport. He had been shot and the truck was gone. Mrs. Wall ran back into the house to call for help, but could not find the portable phone. She and her husband then returned to their vehicle, went to a neighbor's house for help, and found their daughter.

Lieutenant C.T. Chadwick, Jr. arrived at the Yokley home in response to a radio dispatch. He testified he found some broken glass, a rifle, and a number of spent .22 caliber shell casings at the scene. Upon searching the area, he observed a truck parked in some neighboring woods with broken glass on the passenger's side and four distinct bullet holes in the driver's side door. In the interior of the truck were personal items, as well as a pillow stained with blood. Entering a nearby residence later determined to belong to Bumgarner, Chadwick and other officers located defendant and Bumgarner, who had minor bullet wounds to his face and shoulder. Officers subsequently unearthed a Colt .22 caliber pistol buried in the backyard of the house.

Dr. Wayne Meredith testified as to Wall's injuries which included three gunshot wounds: one superficial wound to the scalp, a wound to the arm, and a serious wound to the chest which damaged many internal organs including Wall's lung, stomach, colon, spleen, pancreas, and kidney. Treatment included removal of portions of his colon and large intestine and removal of his entire spleen, as well as approximately one-third of his pancreas. The process involved several operations and Wall remained in the hospital in excess of one year.

In August 1992 and against medical advice, Wall determined to undergo colostomy removal surgery. He acknowledged the risk involved to his physicians, but stated he would rather be dead than

continue to endure his condition as it was. Wall did not survive the operation and died 1 September 1992.

Donald Jason, an expert in the field of pathology, testified as follows:

Q:   And in your opinion, sir, what was the cause of death of Bobby Lee Wall?

A:   Cause of death was Adult Respiratory Distress Syndrome—that's that injury to the lung that I mentioned—which was due to the operation for reconnection of his large intestine. And that was caused by the fact—by the injuries in his abdomen, particularly the injury to the large intestine, and that was caused by the bullet wound which had gone through the abdomen.

Q:   All of these complications were the result of that bullet wound that went through his chest and into his abdomen?

A:   That's right. It all began with the bullet wound.

Defendant offered the following testimony on his own behalf: During the afternoon of 3 July 1990, defendant went to visit Bumgarner at the latter's residence, but Bumgarner was not home. Defendant decided to wait for Bumgarner, and while doing so, consumed "a couple beers." When Bumgarner returned, he and defendant decided to take a ride and visit some friends.

Defendant admitted taking valium during the course of the evening. He remembered leaving a friend's house with Bumgarner driving the truck, and further claimed the next thing he remembered was being awakened by Bumgarner and being told to get out of the truck. They then walked through the back door of a home defendant assumed belonged to Bumgarner. Defendant could not recount exactly what happened in the house before seeing Mrs. Wall, but he realized upon seeing her that they were not at Bumgarner's residence.

Upon retreating from the house, defendant saw a man standing at the corner of the garage pointing a rifle. Defendant put his hands in the air, continued towards the truck, and told the man he just wanted to leave. As defendant shut the truck door after getting in, the man began shooting at the driver's side where defendant was seated. Because a vehicle was parked behind the truck, defendant pulled up

and back several times in order to turn and drive across the yard to leave. The man continued to shoot and defendant told Bumgarner there was a pistol under the seat. Bumgarner retrieved the pistol and fired it out the driver's side window into the air. Defendant did not recall taking anything from Yokley's house.

Bumgarner testified he stopped at Yokley's home to see if his dog would fight with her dog. He further stated he followed defendant into the house and that both immediately ran to the truck when they encountered Mrs. Wall. Further, he indicated it was defendant who asked for the pistol and fired from the truck.

In rebuttal, the State offered Bumgarner's statement to Deputy J.L. Mecum that he and defendant entered the Yokley residence for the purpose of stealing some VCR and radio equipment as well as a camcorder.

## I.

Defendant first contends the trial court erred by denying his motion to dismiss the charges of voluntary manslaughter and first degree burglary. We disagree.

In ruling upon a motion to dismiss, the trial court must view the evidence in the light most favorable to the State, which is entitled to every reasonable inference to be drawn therefrom. *State v. Bates*, 313 N.C. 580, 581, 330 S.E.2d 200, 201 (1985) (citations omitted). If there is "substantial evidence" of each element of the charged offense and of defendant being the perpetrator of the offense, the motion should be denied, *State v. Riddick*, 315 N.C. 749, 759, 340 S.E.2d 55, 61 (1986) (citing *State v. Earnhardt*, 307 N.C. 62, 65-66, 296 S.E.2d 649, 651-52 (1982)). "Substantial evidence is that amount of evidence which a reasonable mind might accept as adequate to support a conclusion". *State v. Rich*, 87 N.C. App. 380, 382, 361 S.E.2d 321, 323 (1987) (citing *State v. Cox*, 303 N.C. 75, 87, 277 S.E.2d 376, 384 (1981)). In addition, " '[t]he trial court is *not* required to determine that the evidence excludes every reasonable hypothesis of innocence . . . .' " *Riddick*, 315 N.C. at 759, 340 S.E.2d at 61 (quoting *State v. Powell*, 299 N.C. 95, 101, 261 S.E.2d 114, 118 (1980)).

## A.

We first consider the charge of voluntary manslaughter. Defendant argues his actions were not the cause of Wall's death and that the State failed to prove he did not act in self-defense.

1.

[1] Proximate cause is an element of manslaughter, *State v. Sherrill*, 28 N.C. App. 311, 313, 220 S.E.2d 822, 824 (1976), that is, criminal responsibility arises only if a defendant's act has "caused or directly contributed" to the victim's death. *State v. Luther*, 285 N.C. 570, 573, 206 S.E.2d 238, 240 (1974). Further, "the act of the accused need not be the immediate cause of death. He is legally accountable if the direct cause is the natural result of [the] criminal act." *State v. Minton*, 234 N.C. 716, 722, 68 S.E.2d 844, 848 (1952) (citations omitted).

Despite testimony from the pathologist that Wall died as a result of complications from the bullet wound to his chest and abdomen, defendant insists the cause of death was Wall's decision against medical advice to undergo colostomy reversal surgery. However, "[t]he act complained of does not have to be the sole proximate cause of death, nor the last act in sequence of time. . . . It is enough if defendant['s] unlawful acts join and concur with other causes in producing the result." *State v. Cummings*, 46 N.C. App. 680, 683, 265 S.E.2d 923, 925-26, *aff'd*, 301 N.C. 374, 271 S.E.2d 277 (1980) (citations omitted). The pathologist's testimony presented sufficient evidence from which the jury could find Wall's gunshot wound caused or directly contributed to his death, whatever complications may have arisen as a result of the later surgery.

In *State v. Jones*, 290 N.C. 292, 225 S.E.2d 549 (1976), the State's evidence tended to show the victim suffered from a chronic lung disease which left his lungs black, scarred, and fibrous. *Id.* at 298, 225 S.E.2d at 552. He was shot during a robbery, and shotgun pellets which entered his lungs caused the lungs to collapse and severe infection ensued. *Id.* Physicians administered antibiotics to combat the infection, including a drug called gantrisin. *Id.* Unfortunately, the victim was hypersensitive to the drug and developed myocarditis, inflammation of the heart, which was the immediate cause of his death. *Id.* Our Supreme Court held the evidence was sufficient to carry the question of proximate cause to the jury, stating "[w]here . . . gunshot wounds inflicted by the accused are a contributing cause of death, defendant is criminally responsible therefor." *Id.* at 299, 225 S.E.2d at 552-53.

In *State v. Penley*, 318 N.C. 30, 38, 347 S.E.2d 783, 788 (1986), the victim died of pneumonia. Testimony by the pathologist revealed the gunshot wound suffered by the victim had "compressed and damaged

**STATE v. GILREATH**

[118 N.C. App. 200 (1995)]

his spinal cord" to the point that he was paralyzed from the waist down and rendered him immobile. *Id.* This immobility in turn resulted in the formation of infectious blood clots in his lungs which, in turn, caused pneumonia. *Id.* As such, there was a direct relationship between the gunshot wound and the victim's death since his immobility and the blood clot formation were secondary to the original gunshot injury to the spinal cord. *Id.* at 48-49, 347 S.E.2d at 794. The Court held the evidence sufficient to withstand a motion to dismiss on the issue of proximate cause. *Id.*

Finally, in *State v. Garcia-Lorenzo*, 110 N.C. App. 319, 430 S.E.2d 290 (1993), a voluntary decision by family members and attending physicians to remove the victim from life support systems did not absolve the defendant from criminal responsibility. *Id.* at 334-35, 430 S.E.2d at 298-99. Testimony of the medical examiner indicated the victim was not brain dead and that he could have remained alive indefinitely on a respirator. *Id.* at 334, 430 S.E.2d at 298. Defendant therefore argued his acts were not the proximate cause of the victim's death given the voluntary choice to remove the artificial support systems. *Id.* We rejected this contention, stating "but for defendant's act of hitting [the victim], he would not have been in this vegetative state, unable to breathe on his own or to regain consciousness, and subsequently he would not have died." *Id.*

Based on the foregoing authorities and viewing the evidence in the light most favorable to the State, we conclude there was substantial evidence tending to show Wall's gunshot wound directly contributed to his death. The issue of proximate cause was thus properly submitted by the trial court to the jury.

Defendant parenthetically interjects the alternative argument that, at a minimum, the jury should have been instructed it "must find from the evidence and beyond a reasonable doubt that Mr. Wall's death resulted proximately from the gunshot wounds inflicted by the Defendant." This contention is completely without merit.

In charging the jury, the court stated as follows:

Now, I charge for you to find the defendant guilty of voluntary manslaughter, the State must prove three things beyond a reasonable doubt:

. . . .

Second, that the defendant's act was a proximate cause of the victim's death. A proximate cause is a real cause, a case without which the victim's death would not have occurred. The defendant's act need not have been the last cause or the nearest cause. It is sufficient if it concurred with some other cause acting at the same time which in combination with it proximately caused the death to the victim.

And third, that the defendant did not act in self-defense or, though acting in self-defense, was the aggressor or, though acting in self-defense, used excessive force.

Thus, the court instructed the jury precisely as defendant suggests was necessary, *i.e.*, that it was required to find beyond a reasonable doubt that defendant's act of inflicting a gunshot wound upon Wall proximately caused Wall's death.

2.

[2] Defendant further argues his motion to dismiss the charge of voluntary manslaughter was erroneously denied because "[t]he State failed to prove beyond a reasonable doubt that the [d]efendant did not act in self[-]defense." We do not agree.

It is established that the State in a homicide prosecution bears the burden of proving the defendant did not act in self-defense when that issue is raised by the evidence. *State v. Hamilton*, 77 N.C. App. 506, 513, 335 S.E.2d 506, 511 (1985), *disc. review denied*, 315 N.C. 593, 341 S.E.2d 33 (1986) (citing *State v. Herbin*, 298 N.C. 441, 445, 259 S.E.2d 263, 267 (1979)). However, as noted above, the test on a motion to dismiss is whether the State has presented substantial evidence which, taken in light most favorable to the State, is sufficient to convince a rational trier of fact the defendant did not act in self-defense. *Id.*

Defendant herein, relying solely upon his version of the incident, argues the fatal shot occurred in self-defense only after he and Bumgarner fled the premises and were fired upon by Wall. He further insists all the evidence shows Wall acted unreasonably in using deadly force to prevent the escape of defendant and his cohort.

In response, the State points to testimony by Mrs. Wall and to physical evidence which contradicts defendant's version of the shooting encounter. Specifically, the State notes the statement by Mrs. Wall that she heard a single shot fired followed by a "whole bunch" of gunshots, and that she heard her husband yell for the two men to stop or

he would shoot. The State contends this evidence tends to show Wall fired a warning shot "in an effort to detain [defendant and his companion] and to prevent any aggressive actions on their part," and that his shots into the truck were in response to being fired upon by the occupants.

Further, the State observes Wall was only eight to ten feet from the truck on the driver's side, and that defendant was required to move the vehicle back and forth in order to exit the driveway around the Wall automobile. The State argues this evidence "tends to indicate [Wall] reasonably feared for his safety from being hit by the escaping vehicle as it pulled up and back."

Suffice it to state the evidence of self-defense at best was in conflict. Accordingly, the circumstances permitted conflicting inferences which were for the jury to reconcile. *State v. Ataei-Kachuei*, 68 N.C. App. 209, 214, 314 S.E.2d 751, 754, *disc. review denied*, 311 N.C. 763, 321 S.E.2d 146 (1984). We thus conclude the State presented substantial evidence that defendant failed to act in self-defense and that the issue was properly submitted to the jury for its resolution.

**[3]** Defendant also argues Wall was prohibited from detaining defendant legally in that there was no evidence a felony had been committed in Wall's presence or that defendant and Bumgarner posed a significant threat of death or physical injury to others.

Concerning defendant's argument as to Wall's actions, we note N.C. Gen. Stat. § 15A-404 (1988) provides that a private citizen may use reasonable means to detain another person who the citizen has probable cause to believe has committed in his presence either a felony, a breach of the peace, a crime involving physical injury to another person, or a crime involving theft or destruction of property.

In the foregoing regard, the evidence at trial indicated that the Walls, at the time of their arrival at the Yokley residence, knew only that their daughter had telephoned at approximately 2:15 a.m. to report someone was breaking into her home and that the call was then cut off. They observed a strange vehicle in the driveway and two individuals were interrupted in the process of removing certain components of an entertainment center in the home. The two ran from the dwelling. The jury could thus reasonably conclude Wall had cause to believe the felony of burglary was being committed in his presence.

Wall also commanded the men to stop. The evidence further suggests Wall fired a warning shot followed by many successive gun-

shots. In addition to the foregoing, based upon the proximity of Wall to the maneuvering of defendant's truck as the men attempted to escape, the jury could reasonably determine Wall was in the direct path of the vehicle which posed a substantial threat of injury to him.

In sum, having determined the State presented substantial evidence as to the element of proximate cause and from which the jury could infer defendant did not act in self-defense, we hold the trial court did not err in denying defendant's motion to dismiss on the charge of voluntary manslaughter.

### B.

[4] Concerning the charge of first degree burglary, defendant asserts the State failed to meet its burden of proving the Yokley residence was occupied at the time defendant entered and that his motion to dismiss the charge should have been allowed. This argument lacks merit.

First degree burglary is the breaking and entering of the presently occupied dwelling house of another, in the nighttime, with the intent to commit a felony therein. N.C. Gen. Stat. § 14-51 (1993). The question of whether or not the dwelling is actually occupied at the time of entry is for the jury. *State v. Simons*, 65 N.C. App. 164, 167, 308 S.E.2d 502, 503 (1983).

The uncontradicted evidence in the case *sub judice* reveals Yokley was asleep in her home at about 1:30 in the early morning of 4 July 1990. She was awakened by sounds of the kitchen door being kicked in. Going to the door of her bedroom, she saw a man enter her daughter's bedroom while another came into the house through the kitchen. Defendant himself acknowledged he and Bumgarner arrived at the residence together and entered the house through the back door. Once Yokley had an opportunity to escape from the house, she picked up a portable phone from the kitchen and contacted her mother to report the intruders.

In view of the uncontroverted evidence that the Yokley dwelling was indeed occupied at the time defendant entered, it was not error for the trial court to deny his motion to dismiss the charge of first degree burglary.

## II.

## A.

Defendant next insists no evidence corroborated Yokley's testimony that she was in her residence at the time defendant entered it. Therefore, he continues, the court erred by denying his request to submit the lesser offense of second degree burglary to the jury. This assertion is without merit.

Where *all* of the evidence presented shows the dwelling was occupied at the time of the breaking and entering, the court is not authorized to instruct the jury it may return a verdict of burglary in the second degree. *State v. Tippett*, 270 N.C. 588, 595, 155 S.E.2d 269, 274 (1967), *overruled on other grounds, State v. Worsley*, 336 N.C. 268, 443 S.E.2d 68 (1994) (emphasis added). Contrary to defendant's claim that "evidence was not conclusive on the question of occupancy," Yokley's testimony as noted above was that she heard "the sound of [the] kitchen door crashing up against the wall" and saw defendant and Bumgarner entering her home through the kitchen. There was no error in the trial court's refusal to instruct on second degree burglary.

## B.

Finally, defendant argues the court erred by denying his request that the lesser offense of involuntary manslaughter be submitted to the jury. However, defendant fails to cite any authority in support of this proposition. Accordingly, pursuant to N.C.R. App. P. 28(b)(5) (1994), we deem this assignment of error abandoned. Further, even assuming defendant's argument on this point had been raised properly, our examination of the evidence reveals no error by the trial court in refusing to submit the charge of involuntary manslaughter to the jury.

No error.

Judges EAGLES and ORR concur.

Judge ORR concurred prior to 5 January 1995.